928 F.2d 1336
 SOUTHSIDE FAIR HOUSING COMMITTEE; Lucy Rodriguez; Miguel
De Los Santos; Israel Rosario; Conrado Diaz; Norma Diaz
Tejada; Bolivar Pascual; Carmelo Gonzalez; Franciso
Peguero; Luz Baez; Diana Dawson; Blanca Rivera; Irma
Montero; Charles L. Mercado; Maritza Andujar; Reyna
Gonzalez; Iris Pena; Leroy Beckles; Gustavo Mueses,
individually and on behalf of all others similarly situated,
Appellants,
v.
The CITY OF NEW YORK; New York City Department of Housing
Preservation and Development; and United Talmudic
Academy; Torah V'Yirah Inc., Appellees.
 No. 1251, Docket 91-7045.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 20, 1991.
Decided March 26, 1991.
 
 Lewis M. Steel, New York City (Susan Ritz, Richard F. Bellman, and Steel Bellman & Ritz, New York City, Ruben Franco, Ken Kimerling, and Puerto Rican Legal Defense and Educ. Fund, Inc., New York City, Martin S. Needelman, Foster S. Maer, Mauricio Hernandez, and Brooklyn Legal Services Corp., Brooklyn, N.Y., on the brief) for appellants.
 Fay Leoussis, New York City (Victor A. Kovner, Corp. Counsel, Leonard Koerner, Thomas Bergdall and Richard Klein on the brief) for municipal appellees.
 Jonathan M. Wagner, New York City (Marvin E. Frankel, Robin S. Feingold, and Kramer, Levin, Nessen, Kamin & Frankel, New York City, on the brief) for appellee United Talmudic Academy, Torah V'Yirah, Inc.
 Jeremiah S. Gutten, Gail A. Wechsler, and Levy, Gutman, Goldberg & Kaplan, New York City, filed a brief for amici curiae New York Civ. Liberties Union Foundation and Americans for Religious Liberty.
 Before FEINBERG, TIMBERS and MINER, Circuit Judges.
 TIMBERS, Circuit Judge:
 
 
 1
 This is an appeal from an order entered November 2, 1990, 750 F.Supp. 575, and from an order and judgment entered November 30, 1990 in the Eastern District of New York, Eugene H. Nickerson, District Judge, 750 F.Supp. 575, denying injunctive relief to appellants and entering final judgment in favor of appellees pursuant to Fed.R.Civ.P. 54(b).
 
 
 2
 The individual appellants are Latino and African-American citizens who live in the South Williamsburg neighborhood of Brooklyn. The organizational appellant, Southside Fair Housing Committee (Southside), is composed of individuals and groups who reside in that area. Southside's self-described purpose is to "promote a racially and religiously integrated" community.
 
 
 3
 Appellants commenced this action on January 3, 1990, alleging, inter alia, violations of their first and fourteenth amendment rights in connection with the sale of urban renewal property in Williamsburg to appellee United Talmudic Academy (Academy), the educational arm of the Hasidic Congregation Yetev Lev D'Satmar, Inc. (Satmar Congregation), for development as a boys' yeshiva (Jewish religious school), an apartment complex for yeshiva faculty and a 6,000 seat synagogue. Southside opposes "the establishment of the Area as a white Hasidic enclave" and ultimately seeks "the creation of badly needed racially and religiously integrated housing for lower income persons and particularly Latino and African-American persons."
 
 
 4
 On appeal, appellants contend that the district court misapplied the Lemon test in deciding the first amendment establishment clause claims; that appellants established that the contested urban renewal land transfers were made in violation of the first amendment establishment clause; and that the actions of the municipal appellees regarding the development of urban renewal land in South Williamsburg violated the fourteenth amendment equal protection clause. For the reasons set forth below, we affirm.
 
 I.
 
 5
 We shall set forth only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal. In order to fully appreciate appellants' claims, it is necessary to set forth, at some length, the protracted and somewhat complicated process by which the disputed land sales came about.
 
 
 6
 Many of the background facts are undisputed. In 1967, appellee the City of New York (City), along with the federal and state governments, created Area I, consisting of about nineteen city blocks in Williamsburg, Brooklyn. The City condemned and cleared the deteriorated property. It provided for the development of the area under an Urban Renewal Plan. Before the clearance, Latinos, together with Orthodox and Hasidic Jews, lived in Area I. The first buildings constructed in Area I after the clearance were 2,350 low and moderate income housing units, to replace the 1,400 deteriorated dwellings that existed prior to urban renewal.
 
 
 7
 Site 4 occupies about one square block of Area I. Prior to 1967, it contained low-rise private housing, some commercial businesses, at least two synagogues, ritual baths, and a yeshiva.
 
 
 8
 The present population of Area I is mixed. There are four large, high-rise subsidized housing developments, each with occupants of various ethnicities. Two smaller units of market rate housing were purchased almost exclusively by Orthodox and Hasidic Jews. Certain other parcels are under development as condominiums, known as Brooklyn Villas, by the United Jewish Organization (UJO). (Disputes regarding Brooklyn Villas are part of the underlying lawsuit, but the Brooklyn Villas matter has been tentatively settled by the parties and is not involved on the instant appeal.) To the north of Area I is another urban renewal area, Area II, created in 1984. It is occupied chiefly by Latinos.
 
 
 9
 During the 1970s, the City chose urban renewal sponsors and developers on a "sole source" basis. The staff of appellee New York City Department of Housing Preservation and Development (HPD) consulted with organizations and people in the local community, including members of the local community boards. They sought out persons established in the community who had a "track record" of succeeding in development projects. HPD favored selection of former site occupants for land development. Tentative designations of developers were reviewed by the local Community Board and the City Planning Commission. The final designation was made by the City Board of Estimate (BOE).
 
 
 10
 Originally, the City considered Site 4 for use as a park. By the early 1970s, however, the HPD started to discuss other so-called "institutional" uses for Site 4. The Academy approached the HPD about constructing on the site a nursing home, a yeshiva, and a medical facility. In July 1977, the HPD proposed subdividing the Site into Sites 4A, 4B, and 4C, and tentatively designated the Academy as the developer of the Sites. The Academy's designation was based, at least in part, on its proven track record of completing similar developments.
 
 
 11
 Using the same "sole source" process, the City designated a Latino Pentecostal church as the developer of another site within Area I, Site 12. Ultimately, however, the Pentecostal congregation abandoned the designation and located outside Area I.
 
 
 12
 No other institution has ever submitted written plans for the development of Site 4, nor did testimony at the district court hearing establish that any Latino organization inquired about the Site even though, as the district court found, "[t]he [HPD] did not bar non-Hasidim from making proposals." Although some developers did make inquiries, none did so before the Academy's designation. Southside has never presented any plan to the City for institutional use of land in Williamsburg. Appellants stipulated at trial that they have no funds themselves to purchase Site 4.
 
 
 13
 In May 1978, HPD submitted the Academy's proposals to the Planning Commission. In August 1978, HPD submitted amendments to the Urban Renewal Plan, changing the designated use of Site 4 from a park to "institutional" use and setting forth the proposed yeshiva, medical facility, and nursing home. The then recently-adopted provision of the City Charter known as the Uniform Land Use Review Procedure (ULURP) required the amendments to go through various reviews and hearings. The Planning Commission first had to certify a proposal. Then the local Community Board, the Planning Commission, and ultimately the BOE had to hold public hearings, review the proposal, and approve or disapprove it. After these steps were taken the BOE, on May 24, 1979, held a hearing and approved the amended Plan.
 
 
 14
 In the early 1980s, the Academy abandoned its plan for a nursing home and medical facility, apparently because government funding was no longer available. It began to seek permission to have Sites 4A and B developed as a yeshiva and dormitory housing (which later developed into a plan to build faculty housing). It also sought to build a synagogue on Site 4C. During this period, the Academy's letter of credit lapsed. The letter of credit was a condition precedent to its continued designation as developer. The HPD threatened to de-designate the Academy and to bar it from future designations. An internal HPD memo stated that the Academy's actions made "the inference of deliberate misrepresentation of their intentions on this site seem highly probable." HPD never took any action against the Academy, however, but continued to work with it until the default was cured. Anthony Gliedman, former Commissioner of HPD, testified that HPD's policy was "to help them through the default ... and to proceed if at all possible. As long as people were trying in good faith, we sought not to de-designate people if at all possible." He testified that he could recall no instance where a community developer was de-designated as a result of a default like the Academy's. Herbert Siegel, director of Brooklyn Planning for HPD, testified that during this period real estate developers and builders had inquired about the possibility of developing Site 4, but were advised that a developer (the Academy) already had been designated.
 
 
 15
 In 1984, HPD proposed to amend the Urban Renewal Plan to change the approved uses of Sites 4A-C from specific institutional uses to generic institutional uses and to amend "institutional use" to include "dormitory facilities affiliated with religious institutions." The proposed amendment to the Plan went through the ULURP process and was ultimately approved by the BOE on May 24, 1984. The Academy's use of Site 4A for a yeshiva and Site 4B for faculty housing was specifically discussed at the Community Board meeting held February 28, 1984. At that same meeting, Siegel explained that the City was going to do "something innovative in order to bring together two communities [Latino and Hasidic] that had previously had disputes." He said that the City was going to commit the funds realized from its sale of parcels in Areas I and II to assist in developing projects to benefit low and moderate income families. This was referred to as a "cross subsidy."
 
 
 16
 After the Urban Renewal Plan was amended, HPD officials initially assumed that the Academy would have to go through the ULURP process to obtain approval of its specific revised plans for Site 4, since the previous (1979) ULURP disposition had been for a yeshiva, nursing home and medical facility, rather than for a yeshiva, faculty housing, and synagogue. An HPD memo dated November 13, 1987, for example, stated that "[w]e need to
 
 
 17
 reULURP the sites for use as 'faculty housing' and a 'synagogue.' " Ultimately, however, the ULURP process was aborted and HPD went directly to the BOE for approval of the land disposition agreement.
 
 
 18
 On February 1, 1988, the property was appraised at a fair market value of $680,000. On July 14, 1988, the BOE, after public notice and a hearing, approved the contract of sale between the City and the Academy at the appraised price. One day prior to the July 14 meeting, the Community Board Vice Chairman asked that the matter be laid over until the August 11 meeting of the BOE. Since this would have imposed substantial penalties on the purchaser because of the necessity of a new appraisal, the BOE agreed to approve the sale. Before title passed, however, the HPD submitted the matter to the Community Board for comments and a recommendation. About 30 people attended a July 25, 1988 Community Board ULURP Committee meeting and approved the proposal. The Committee found that the sale was consistent with the Urban Renewal Plan, would provide cross subsidy money and would not impact negatively the surrounding community. (Earlier, on July 15, the Community Board, in a letter to HPD, had expressed "shock[ ]" that it had learned that " 'institutional use' " now meant "a 6,000 seat synagogue ..., a school with 30 classrooms, and 68 units of faculty housing...." The Board expressed concern that it had not been given an opportunity to comment on the proposed institutional uses prior to the sale.)
 
 
 19
 On August 10, 1988, the Chairmen of the Community Board and the ULURP Committee wrote a joint letter to the Mayor enclosing a copy of the full Committee recommendation. The Academy broke ground in October 1988.
 
 
 20
 Appellants commenced this action on January 3, 1990, complaining that appellees were attempting to create a white Hasidic enclave in violation of appellants' constitutional rights. After holding an extensive evidentiary hearing, the district court, on November 2, filed a memorandum and order denying preliminary and permanent injunctive relief to appellants. On November 30, it entered an order pursuant to Fed.R.Civ.P. 54(b), directing that final judgment be entered on the Site 4 claim.
 
 
 21
 This expedited appeal followed. The New York Civil Liberties Union Foundation and Americans for Religious Liberty have submitted a brief as amici curiae.
 
 II.
 
 22
 We turn first to the threshold questions of our jurisdiction and the relevant standard of review.
 
 Jurisdiction
 A. STANDING
 
 23
 Intertwined with our own jurisdictional inquiry is the question of appellants' standing, an issue that was raised below but not pressed--or even argued--on appeal. The district court stated that it did not address appellees' standing argument in light of that court's decision against appellants on the merits. As we stated in a recent case, however, "[a]lthough the district court explicitly chose not to reach this issue, it is fundamental that 'Article III of the Constitution confines the federal courts to adjudicating actual "cases" and "controversies." ' " Fulani v. League of Women Voters Educ. Fund, 882 F.2d 621, 624
 
 
 24
 (2 Cir.1989) (quoting Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)). Indeed, if appellants fail to satisfy threshold standing requirements, "then as a general principle, we are without jurisdiction to entertain this appeal." Fulani, supra, 882 F.2d at 624; see also Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. In both dimensions it is founded in concern about the proper--and properly limited--role of the courts in a democratic society." (citation omitted)); New York State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1346
 
 
 25
 (2 Cir.1989) ("The 'threshold question in every federal case' is whether a federal court has the authority to adjudicate the lawsuit."), cert. denied, --- U.S. ----, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990). Accordingly, despite appellees' implicit suggestion that we simply bypass standing and go straight to the merits, we are constrained to make the threshold standing inquiry.
 
 
 26
 In Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), a starting point for many courts' standing analyses, the Supreme Court articulated the relevant inquiry: "Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions? This is the gist of the question of standing." While "[d]eceptively simple to state," however, "standing entails a complex three-pronged inquiry." In re United States Catholic Conference (USCC), 885 F.2d 1020, 1023 (2 Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1946109 L.Ed.2d 309 (1990). In Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 756, 70 L.Ed.2d 700 (1982), the Supreme Court articulated that inquiry in the context of setting forth the minimum requirements for standing:
 
 
 27
 "at an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' "
 
 
 28
 (citations omitted). As we stated in In re USCC, supra, "[t]he second and third prongs--traceability and redressability--often dovetail; essentially, both seek a causal nexus between the plaintiff's injury and the defendant's assertedly unlawful act." 885 F.2d at 1024.
 
 
 29
 (1) Injury Sustained
 
 
 30
 A plaintiff must allege "a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants." Warth, supra, 422 U.S. at 501, 95 S.Ct. at 2206. An association, such as Southside, may have standing "solely as the representative of its members", provided it alleges that "its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." Id. at 511, 95 S.Ct. at 2211; see also Terry, supra, 886 F.2d at 1348-49 (delineating conditions for organizational standing and holding that National Organization for Women satisfied those conditions in a case involving women's access to abortion clinics).
 
 
 31
 Evaluating allegations of injury is a particularly difficult task in cases involving noneconomic injury. We use as our point of departure Valley Forge, supra, where the Court held that respondents, a group which included named individual plaintiffs who lived in Maryland and Virginia and an organization headquartered in Washington, D.C., lacked standing to complain of a transfer of government property located elsewhere. 454 U.S. at 486-87, 102 S.Ct. at 765-67. Respondents challenged, on establishment clause grounds, the conveyance of government property located in Chester County, Pennsylvania, to Valley Forge Christian College, a nonprofit educational institution operating under the supervision of a religious order. Id. In denying standing, the Court explicitly "[did] not retreat from ... earlier holdings that standing may be predicated on noneconomic injury." Id. at 486, 102 S.Ct. at 766. The Court stated, however, that: "We simply cannot see that respondents have alleged an injury of any kind, economic or otherwise, sufficient to confer standing." Id. (emphasis in original). Observing that respondents learned of the disputed property transfer through a news release, the Court held that "[t]heir claim that the Government has violated the Establishment Clause does not provide a special license to roam the country in search of governmental wrongdoing and to reveal their discoveries in federal court. The federal courts were simply not constituted as ombudsmen of the general welfare." Id. at 487, 102 S.Ct. at 766 (footnote omitted).
 
 
 32
 Appellants in the case at bar manifestly are situated differently than the respondents were in Valley Forge. Far from "roam[ing] the country in search of governmental wrongdoing," appellants here have focused their concerns on their own backyards. As the court recently held in Foremaster v. City of St. George, 882 F.2d 1485, 1491 (10 Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990), where it was faced with the question whether the plaintiff had standing to challenge the depiction of a Mormon temple on an official municipal logo, standing can be premised on a plaintiff's "direct personal contact with offensive municipal conduct...."
 
 
 33
 In assessing appellants' alleged injury, we look to their complaint, reading it in the light most favorable to them. Fulani, supra, 882 F.2d at 625; see also Warth, supra, 422 U.S. at 501, 95 S.Ct. at 2206. Appellants allege that:
 
 
 34
 "[The] defendants' policies and practices ... [have had] the ... effect of transforming the Area into a white Hasidic Jewish enclave.
 
 
 35
 ....
 
 
 36
 As a consequence of the actions challenged in this case, the Area, which was once a racially and religiously mixed neighborhood, has become increasingly and substantially segregated on racial and religious grounds, with a large proportion of the Latino and African-American population being displaced to neighborhoods outside the Area."
 
 
 37
 We hold that appellants in the instant case have alleged injury adequately. They live in the very neighborhood where the disputed land sales took place and claim that they are being displaced by the creation of an exclusive white Hasidic enclave.
 
 
 38
 (2) Traceability and Redressability
 
 
 39
 Having overcome the first hurdle set forth in Valley Forge, by alleging a sufficient injury, appellants also meet the remaining two requirements for standing as delineated in Valley Forge. First, in their complaint, appellants' alleged injury is traced to the City's actions:
 
 
 40
 "The defendants have acted to accomplish this transformation through a series of public and private actions, including municipal clearance of much of the pre-existing housing and non-housing facilities in the Area; ... and through the sale of large amounts of City owned land in the Area for construction of facilities used or to be used exclusively for religious purposes and exclusively by members of the white Hasidic community.
 
 
 41
 Fundamental to the effort to convert the Area into a white Hasidic enclave is the sale by the Municipal Defendants of an entire City block ('Site 4') ... to the ... Academy, [which] plans to construct a complex of facilities on Site 4 for the exclusive use of the Satmar sect of the Hasidic community...."
 
 
 42
 Second, appellants' complaint addresses redressability, although this presents a somewhat closer question. To the extent that appellants allege the creation of an Hasidic "enclave" and yet focus on the sale of one parcel of land, i.e., Site 4, there appears to be some tension between the injury alleged and the primary relief requested (an injunction cancelling the sale and transfer of Site 4 and one other Site and reconveying the land to the City). Reading the complaint liberally, however, as we are constrained to do, we interpret appellants' focus on Site 4 to be essentially a claim that this sale represented the "straw that broke the camel's back." Site 4 occupies one City block in Brooklyn. Arguably, by setting aside that sale and reconveying the land to the City, the land would be developed in a religiously insignificant way and would "reverse the trend" that appellants complain of. Furthermore, we note that appellants seek relief other than a reconveyance of Site 4, including voiding of the cross subsidy agreement, a broad prohibition on "racially and religiously discriminatory policies and practices" of land disposition in South Williamsburg, and a direction that the City take "affirmative steps ... to remedy the effects of [their] discriminatory practices...." We find that appellants' have adequately alleged redressability.
 
 
 43
 B. FINALITY OF THE DISTRICT COURT'S DECISION
 
 
 44
 Having concluded that appellants have standing, we hold that we have jurisdiction over the Site 4 claim pursuant to 28 U.S.C. Sec. 1291 (1988), which provides for appellate jurisdiction over final decisions of the district courts. Pursuant to Fed.R.Civ.P. 54(b), the district court expressly found "no just reason for delay" of appellate review of the Site 4 matter and directed the entry of final judgment with respect to that claim.
 
 Standard of Review
 
 45
 In evaluating the claims raised, clearly appellants' allegations of error hinge primarily upon the district court's conclusions with respect to the first and fourteenth amendments. Most of the background facts of this case are undisputed. To the extent that the district court resolved disputed questions of fact at the hearing in the district court, those findings will not be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a); Amadeo v. Zant, 486 U.S. 214, 223, 108 S.Ct. 1771, 1777, 100 L.Ed.2d 249 (1988); Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1777, 84 L.Ed.2d 518 (1985).
 
 
 46
 On the other hand, "Rule 52(a) does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." Bose Corp. v. Consumers Union, 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984); see also Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 937
 
 
 47
 (2 Cir.) (same), aff'd, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). The district court's use of facts to determine that the sale of land to the Satmar Congregation did not violate either the first or the fourteenth amendment involves conclusions of law that are subject to de novo review. See Lever Bros. v. American Bakeries Co., 693 F.2d 251, 255 n. 4 (2 Cir.1982). With respect to appellants' fourteenth amendment discrimination claim, however, "[a] finding of discriminatory intent is a finding of fact, as are findings of discrimination...." United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1218 (2 Cir.1987) (citation omitted), cert. denied, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).
 
 
 48
 We hold that we have jurisdiction in the instant case and that our review of the district court's findings is governed by the dictates of Rule 52.
 
 III.
 
 49
 We turn next to appellants' contention that the City's sale of land to the Satmar Congregation violated the establishment clause of the first amendment. We start by setting forth guidelines derived from the abundant writings of the Supreme Court in this elusive area of constitutional law. See Kaplan v. City of Burlington, 891 F.2d 1024, 1027 (2 Cir.1989) ("The Supreme Court decisions dealing with the vexing question of separation of church and state have been the occasion for the spending of much ink in the opinions themselves"), cert. denied --- U.S. ----,110 S.Ct. 2619, 110 L.Ed.2d 640 (1990).
 
 Difficulty of Line-Drawing
 
 50
 In evaluating appellants' claim in the context of controlling Supreme Court precedent, it is clear that our task is one of difficult line-drawing. See County of Allegheny v. American Civil Liberties Union, 92 U.S. 573,109 S.Ct. 3086, 3117, 106 L.Ed.2d 472 (1989) (O'Connor, J., concurring) ("Judicial review of government action under the Establishment Clause is a delicate task.").
 
 
 51
 In Walz v. Tax Commission, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970), the Court stated that "for the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity." See also Tilton v. Richardson, 403 U.S. 672, 677, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790 (1971); see generally Everson v. Board of Educ., 330 U.S. 1, 8-16, 67 S.Ct. 504, 507-512, 91 L.Ed. 711 (1947) (providing history and general background of first amendment). The Court in Walz went on to say that:
 
 
 52
 "The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference."
 
 
 53
 397 U.S. at 669, 90 S.Ct. at 1412. In Walz, the Court held that granting tax exemptions to churches did not run afoul of the establishment clause. The "room for play" articulated by the Court in that case clearly recognized the difficulty in trying to establish a "bright line test" for determining what is "establishment" and what is not. "Instead the courts have made case-specific examinations of the challenged government action...." Allegheny, supra, 109 S.Ct. at 3117 (O'Connor, J., concurring).
 
 
 54
 In the Supreme Court's seminal opinion in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), Chief Justice Burger stated that "[c]andor compels acknowledgement ... that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law." Id. at 612, 91 S.Ct. at 2111. Going on to explain the courts' struggles with the first amendment, he said:
 
 
 55
 "The language of the Religion Clauses of the First Amendment is at best opaque, particularly when compared with other portions of the Amendment. Its authors did not simply prohibit the establishment of a state church or a state religion, an area history shows they regarded as very important and fraught with great dangers. Instead they commanded that there should be 'no law respecting an establishment of religion.' "
 
 
 56
 Id. (emphasis in original).
 
 
 57
 Lemon Test and Beyond: A Particular Concern With Endorsement
 
 
 58
 Despite the Court's acknowledged difficulty with lines of demarcation, it stated in Lemon that it was necessary to "draw lines with reference to the three main evils against which the Establishment Clause was intended to afford protection: 'sponsorship, financial support, and active involvement of the sovereign in religious activity.' " Id. (citing Walz, supra, 397 U.S. at 668, 90 S.Ct. at 141). The Court then articulated the now-familiar "Lemon test," which was less a new formulation than a synthesis of precedent:
 
 
 59
 "Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243 [88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060] (1968); finally, the statute must not foster 'an excessive government entanglement with religion.' "
 
 
 60
 Lemon, supra, 403 U.S. at 612-13, 91 S.Ct. at 2111-112 (quoting Walz, supra, 397 U.S. at 674, 90 S.Ct. at 1414).
 
 
 61
 Lemon's "trilogy of tests has been applied regularly in the Court's later Establishment Clause cases"; however, as Justice Blackmun pointed out in his majority opinion in Allegheny:
 
 
 62
 "Our subsequent decisions further have refined the definition of governmental action that unconstitutionally advances religion. In recent years, we have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause jurisprudence."
 
 
 63
 Allegheny, supra, 109 S.Ct. at 3100 (citing Engel v. Vitale, 370 U.S. 421, 436, 82 S.Ct. 1261, 1269, 8 L.Ed.2d 601 (1962)).
 
 
 64
 Asking whether challenged action has the purpose or effect of "endorsing" religion helps give content to Lemon's "primary effect" prong. Application of the Lemon test, and particularly the second prong, is natural in the school-aid context. E.g., Lemon, supra, 403 U.S. at 612, 91 S.Ct. at 2111; see also Grand Rapids School Dist. v. Ball, 473 U.S. 373, 383, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985) ("We have particularly relied on Lemon in every case involving the sensitive relationship between government and religion in the education of our children."); Roemer v. Maryland Public Works Bd., 426 U.S. 736, 755, 96 S.Ct. 2337, 2349, 49 L.Ed.2d 179 (1976) ("the primary-effect question is the substantive [question whether] private educational activities, by whatever procedure, may be supported by state funds").
 
 
 65
 Outside the school-aid context, the Lemon test itself tends to focus on the question of endorsement. E.g., Allegheny, supra, 109 S.Ct. at 3100; see also id. at 3120 (O'Connor, J., concurring). Even in Ball, supra, a case involving the public financing of classes for nonpublic school students, Justice Brennan cited "endorsement" as one way in which the Lemon primary effect test could be violated:
 
 
 66
 "the challenged public school programs operating in the religious schools may impermissibly advance religion in three different ways. First, the teachers participating in the programs may become involved in intentionally or inadvertently inculcating particular religious tenets or beliefs. Second, the programs may provide a crucial symbolic link between government and religion.... Third, the programs may have the effect of directly promoting religion by impermissibly providing a subsidy to the primary religious mission of the institutions affected."
 
 
 67
 473 U.S. at 385, 105 S.Ct. at 3223 (emphasis added); cf. id. at 401, 105 S.Ct. at 3231 (Rehnquist, C.J., dissenting) ("The Court today attempts to give content to the 'effects' prong of the Lemon test by holding that a 'symbolic link between government and religion' creates an impermissible effect." (citation omitted)).
 
 
 68
 Some opinions have focused almost exclusively on the question of endorsement, suggesting that such a focus represents an appropriate departure from Lemon. In Lynch v. Donnelly, 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984), for example, Chief Justice Burger stated that "we have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area." In that case the Court wrestled with the constitutionality of a city-sponsored Christmas display in a private park, which display contained as one element a creche (Nativity scene). Id. at 670-71, 104 S.Ct. at 1357-58. The Court further stated that "the focus of our inquiry must be on the creche in the context of the Christmas season." Id. at 679, 104 S.Ct. at 1362. The display also included secular impedimenta of the season, such as reindeer pulling Santa's sleigh, a teddy bear and an elephant, colored lights, and a banner reading "SEASONS GREETINGS." Id. at 671, 104 S.Ct. at 1358. Holding that the creche did not violate the first amendment, the Court explained that "[w]e are unable to discern a greater aid to religion deriving from inclusion of the creche than from these benefits and endorsements previously held not violative of the Establishment Clause." Id. at 682, 104 S.Ct. at 1364; see also Allegheny, supra, 109 S.Ct. at 3120 (O'Connor, J., concurring) ("I continue to believe that the endorsement test asks the right question about governmental practices challenged on Establishment Clause grounds").
 
 
 69
 Indeed, Lemon's tenure as the guiding principle in establishment clause cases may prove short-lived. See Greenhouse, Supreme Court to Take Fresh Look at Disputed Church-State Boundary, N.Y. Times, March 19, 1991, at A16, col. 4. The Supreme Court recently granted certiorari, 59 U.S.L.W. 3464 , --- U.S. ----, 111 S.Ct. 1305, --- L.Ed.2d ---- (U.S. March 18, 1991), to review a First Circuit establishment clause case, Weisman v. Lee, 908 F.2d 1090
 
 
 70
 (1 Cir.1990), which held unconstitutional, under Lemon, a benediction invoking a deity delivered by a member of the clergy at an annual public school graduation. "[A] majority of the current Justices [are] now on record as differing at least to some extent with the 1971 [Lemon ] precedent. For that reason, it is quite possible that the Court may use the new case as a vehicle for reconsidering the precedent...." Greenhouse, supra, at A16, cols. 4-5. In any event, in this case, we will give special attention to the question of endorsement, the concept upon which appellants chiefly rely.
 
 
 71
 In Justice O'Connor's concurring opinion in Lynch, she fleshed out the concept of "endorsement" as follows: "Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." 465 U.S. at 688, 104 S.Ct. at 1367 (O'Connor, J., concurring).
 
 
 72
 Similarly, in Allegheny, Justice Blackmun for the majority wrote:
 
 
 73
 "Whether the key word is 'endorsement,' 'favoritism,' or 'promotion,' the essential principle remains the same. The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.' "
 
 
 74
 109 S.Ct. at 3101 (quoting Lynch, supra, 465 U.S. at 687, 104 S.Ct. at 1367 (O'Connor, J., concurring)).
 
 
 75
 In Allegheny, the Court dealt with the constitutionality of a creche on the Grand Staircase in the County Courthouse and a menorah next to a Christmas tree outside the City-County Building. 109 S.Ct. at 3093. It held that the creche display, but not the menorah display, violated the first amendment. Id. With respect to the creche, the Court stated that, "unlike in Lynch, nothing in the context of the display detracts from the creche's religious message.... [T]he creche stands alone: it is the single element of the display on the Grand Staircase." Id. at 3103-04. The Court held that the creche violated the establishment clause:
 
 
 76
 "Lynch teaches that government may celebrate Christmas in some manner and form, but not in a way that endorses Christian doctrine. Here, Allegheny County has transgressed this line. It has chosen to celebrate Christmas in a way that has the effect of endorsing a patently Christian message: Glory to God for the birth of Jesus Christ."
 
 
 77
 Id. at 3105; see also Kaplan, supra, 891 F.2d at 1031 (display of menorah alone in city park violated establishment clause, following Allegheny ).
 
 IV.
 
 78
 Although both Lynch and Allegheny deal specifically with the display of religious symbols, their teachings have wider application in the establishment clause context. Accordingly, while we apply the Lemon test in the instant case, we will focus on the question of endorsement when addressing the "primary effect" test and will also rely on the questions suggested by Justice Brennan's analysis in Ball, supra, to give further content to that test in the context of the peculiar facts of this case. We will apply the Lemon tests seriatim.
 
 A. SECULAR PURPOSE
 
 79
 We find particularly persuasive the district court's findings with respect to the secular purpose of the sale of land to the Satmar Congregation. In assessing "secular purpose," we must look behind the particular land disposition involved and evaluate the larger plan that led to that disposition. An urban renewal plan, by design, has the secular purpose of improving depressed areas. In the context of such a plan, a City can make provision for sales to all sorts of private users, including religious organizations. See Berman v. Parker, 348 U.S. 26, 34-35, 75 S.Ct. 98, 103-104, 99 L.Ed. 27 (1954). The district court found, based on testimony, that "the City had on various other occasions sold urban renewal land to churches and other synagogues." Indeed, the court found that Site 12 in Area I was tentatively designated for development by a Latino Pentecostal Church, but that the church ultimately did not develop the Site because of its decision to locate outside Area I.
 
 
 80
 Appellants argued in the district court that the sale to the Academy could not have a secular purpose because the Hasidim have a dogma and practices that are exclusionary. Indeed, their allegations regarding exclusivity have permeated this litigation. It is clear that appellants have sincerely-held views that they are being "excluded" from parts of their own neighborhood by the Hasidim. The videotape that they have included in the court record includes extensive, and poignant, footage of fences--fences, appellants seem to suggest, that are intended to keep out "outsiders" like appellants. Furthermore, this is not the first time that we have been embroiled in controversy involving the Hasidim's separatist tendencies and the visceral reactions to those tendencies by others in the community.
 
 
 81
 In Parents' Association v. Quinones, 803 F.2d 1235 (2 Cir.1986), for example, we reversed the denial of injunctive relief where a group of parents complained that the establishment clause was violated when Public School (P.S.) 16 constructed a wall in order to separate off a section of the school for the teaching of remedial classes to Hasidic girls. We stated that "[i]n keeping with their general separatist beliefs, the Hasidim have expressed a desire to keep their children separate." Id. at 1241. Even in that case, however, where we found that the parents would likely demonstrate that the plan to physically isolate Hasidic children from the other schoolchildren had the "primary effect" of advancing religion, id. at 1242, we held that the challenged action had a secular purpose, because the state "plainly has a secular interest in ensuring the education of schoolchildren". Id. at 1240.
 
 
 82
 In asking whether challenged action has a "secular purpose", the particular religious tenets and practices of the religious group that is the purported beneficiary of the action simply are irrelevant. Cf. Zorach v. Clauson, 343 U.S. 306, 310, 72 S.Ct. 679, 682, 96 L.Ed. 954 (1952) ("merits" of program that provided for release of children from school in order to attend religious instruction were "not germane to the narrow constitutional issue presented"). In the instant case, the sale of land to the Satmar Congregation, as part of an urban renewal scheme, had as much secular purpose as the sale to any other religious group would have had in the context of an urban renewal plan. As the Supreme Court stated in Berman, supra, a "balanced, integrated plan" includes "not only new homes but also schools, churches, parks, streets, and shopping centers." 348 U.S. at 34-35, 75 S.Ct. at 103-104 (emphasis added); see also 64th Street Residences v. City of New York, 4 N.Y.2d 268, 275-76, 150 N.E.2d 396, 398-99, 174 N.Y.S.2d 1, 4-5 (sale of land to Fordham University, a denominational institution, at price below what City would have paid for it did not amount to an "unconstitutional grant or subsidy of public moneys to a religious corporation"; the city benefited "by the achievement of its valid municipal purpose of eliminating a slum"), cert. denied, 357 U.S. 907, 78 S.Ct. 1152, 2 L.Ed.2d 1157 (1958).
 
 
 83
 While sensitive to appellants' concerns, the district court properly rejected their argument that sale of City property to the Academy could inherently serve no secular purpose. While acknowledging that "the Hasidim embrace a doctrine and engage in practices that may seem strange to plaintiffs," the court found that acceptance of appellants' position "logically would mean that Hasidic religious organizations could never buy public lands for a synagogue or other religious purposes...." Of course, as the district court indicated, such a prohibition would be suspect as a possible violation of the free exercise clause of the first amendment. We cannot improve on the district court's conclusion that "[i]f a sale, not a gift, of urban renewal land to a church can have a secular purpose, the court can find no justification for applying a different rule to the Hasidim."
 
 
 84
 We hold that within the context of an urban renewal scheme, there is a secular purpose for sales of land for houses of worship--of any type.
 
 B. PRIMARY EFFECT
 
 85
 Appellants claim that the primary effect of the municipal appellees' Area I land transfers, and particularly the Site 4 transfers, is to advance Hasidic Judaism. They also claim that the court erred in applying the wrong test to their claim that the "cumulative effect" of the land transfers and the "circumstances of these transfers" have the impermissible effect of advancing Hasidic Judaism. We disagree.
 
 
 86
 One way in which the action could violate the "primary effect" test would be if the City's actions promoted Hasidic Judaism by "impermissibly providing a subsidy to the primary religious mission of the institutions affected." Ball, supra, 473 U.S. at 385, 105 S.Ct. at 3223. In rejecting appellants' claim here that the subject land transfers violated the second prong of the Lemon test, the court focused almost exclusively on the fact that the land was sold, rather than "handed over" to the Hasidim:
 
 
 87
 "The Academy purchased the land at market value. The City did not expend public funds to accommodate the desires of a religious sect or to promote a tenet of a sect's religious doctrine. The Academy has received no greater benefit than any other individual or organization with sufficient funds to purchase land from the City at market value."
 
 
 88
 The fact that the Academy paid market value for the land, however, is not alone dispositive of appellants' "primary effect" claim. It is not difficult to imagine a case in which the receipt of market value for land would be insufficient to get the City off the hook of Lemon's second prong. For example, if there were warring bidders for various sites, and the City consistently sold to one religious group, even though other groups were making bids of equal value, then the fact that the religious group's bid represented market value would not be dispositive of an establishment clause challenge, because the consistent choice of one religious group over other groups would represent impermissible favoritism. This leads us to the critical question of endorsement, upon which much of appellants' argument is precariously hinged.
 
 
 89
 We do not believe that the system which led to the sales to the Satmar represent an "endorsement" by the City of Hasidic Judaism. First, the same "system" led to the designation of a Latino Pentecostal Church as the developer of a site within Area I. Second, these sales did not give rise to any "symbolic" link between the Satmar Congregation and the government because the land was transferred with the purpose of making it available for private, rather than public, use. In this sense, this case is clearly distinguishable from cases such as Allegheny, supra, relied upon by appellants, that involve religious symbols on government property. We agree with the view, proffered by the municipal appellees, that a reasonable observer passing a synagogue or church built on urban renewal land would have no way of associating that institution with the government. We hold untenable appellants' position that this case, like Ball, supra, "conveys a message of government endorsement or disapproval of religion, [such that] a core purpose of the Establishment Clause is violated." 473 U.S. at 389, 105 S.Ct. at 3225.
 
 
 90
 At this stage, there is no need for us to shy away from the inescapable conclusion that the Hasidim did "benefit", on some level, from these land sales. They wanted property; pursuant to an urban renewal plan and system of land disposition, they were able to purchase it. In analyzing whether the primary effect of the City's actions was to advance Hasidic Judaism, however, we need not hold that no benefit whatsoever was conferred upon the Hasidim. E.g., Hunt v. McNair, 413 U.S. 734, 742, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973) ("Whatever may be its initial appeal, the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected.").
 
 
 91
 Examining the incremental steps that ultimately led to the consummation of sales to the Hasidim of parcels in Site 4, we do not believe that the "primary effect" of those steps--taken singly or together--was to advance religion. Those steps included the designation of the Academy through the "sole source" process, the decision not to "de-designate" the Academy when its letter of credit lapsed, and the decision not to re-ULURP once changes for the sites were contemplated. The primary effect of those steps was to dispose of urban renewal property that might otherwise lie fallow. The fact that the Hasidim are the incidental beneficiaries does not make the system by which the land sales were consummated constitutionally infirm. Committee for Public Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 771, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973) ("not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon religious institutions is, for that reason alone, constitutionally invalid"); see also Meek v. Pittenger, 421 U.S. 349, 359, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975) (same).
 
 
 92
 Prior cases have held specifically that real estate transfers that incidentally benefit religious groups did not violate the Constitution. Annunziato v. New Haven Bd. of Aldermen, 555 F.Supp. 427, 432-33 (D.Conn.1982) (sale of school to religious organization did not violate the establishment clause where sale in blighted neighborhood benefited the City; the City had no standard practice for land disposition, and even though the City's expeditious handling of the request to purchase benefited the religious group, "the Court conclude[d] that no improper purpose can be inferred from the speed of the city's process of decision-making and the primary effect of that process was not to aid [the group]"); 64th Street Residences, supra, 4 N.Y.2d at 276, 150 N.E.2d at 399, 174 N.Y.S.2d at 5 (the system of selling properties "at auctions where there is little likelihood of competing bids" is not invalid); see also Tilton v. Finch, 312 F.Supp. 1191, 1198-99 (D.Conn.1970) (3 judge court) (primary effect of Act authorizing grants to religious schools was not to advance religion), vacated and remanded on other grounds sub nom. Tilton v. Richardson, 403 U.S. 672, 677, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790 (1971).
 
 
 93
 It bears repeating that neither Southside nor any of the individual appellants ever have presented any plan to the City for institutional use of the land that was sold to the Hasidim. Appellants stipulated at trial that they have no funds themselves to purchase Site 4. Essentially, appellants are asserting that by not letting this land lie fallow the City somehow is promoting Hasidic Judaism. We disagree. Rather, "[w]e sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma." Zorach, supra, 343 U.S. at 313-14, 72 S.Ct. at 683-84. There is no constitutional requirement "for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence." Id. at 314, 72 S.Ct. at 684. The first amendment "requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions than it is to favor them." Everson, supra, 330 U.S. at 18, 67 S.Ct. at 513.
 
 
 94
 In Zorach, supra, the Supreme Court held there was no impermissible advancement of religion where public school teachers "cooperated" with religion insofar as they made it possible for students to leave school for religious instruction. 343 U.S. at 313, 72 S.Ct. at 683; see also Everson, supra, 330 U.S. at 17, 67 S.Ct. at 512 (provision of transportation to parochial school students did not violate first amendment even though there was the "possibility that some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets when transportation to a public school would have been paid for by the State").
 
 
 95
 The City's facilitating a land sale at market value is no more offensive to the first amendment than the programs which have been upheld by prior Supreme Court decisions. The City's sale to the Satmar Congregation under the circumstances of this case, while serving to facilitate that sect's practice of religion, did not involve the type of state sponsorship of religion that is prohibited. Supreme Court precedent has "put to rest any argument that the State may never act in such a way that has the incidental effect of facilitating religious activity." Roemer, supra, 426 U.S. at 747, 96 S.Ct. at 2345.
 
 
 96
 Appellants extend their focus beyond Site 4 and assert that the "cumulative effect" of sales to the Hasidim has the primary effect of advancing religion. They claimed below that "the 'cumulative effect' over the years of purchases by Hasidic interests in Area I for non-religious as well as religious uses 'will inexorably lead to the establishment of a religiously and racially exclusive Hasidic enclave' "; they claim now that the district court erred in analyzing their "cumulative effect" argument under the equal protection and due process clauses, which require an intent test, rather than under the establishment clause, which requires only the demonstration of a "primary effect." In challenging the district court's analysis, appellants focus on one sentence of the district court's comprehensive opinion: "The court will discuss the contention of 'cumulative effect' in its treatment of plaintiffs' arguments under the Equal Protection and Due Process clauses of the Fourteenth Amendment."
 
 
 97
 A close examination of appellants' "cumulative effect" claims indicate that they are based largely on concerns that were properly analyzed by the district court pursuant to the fourteenth amendment. For example, appellants claim that "[t]he cumulative effect of the [Area] I land sales was devastating: in addition to dedicating every institutional site to Hasidic use, HPD's plan created market rate housing for Hasidim in place of Section 8 subsidized housing and manufacturing jobs for the plaintiffs." (emphasis added). A dispute about the type of housing to be built hardly lends itself to first amendment analysis. To the extent that appellants voice concern about the "cumulative effect" of City land sales that have resulted or will result in development of religious institutions for the Hasidic (including, for example, synagogues and yeshivas), appellants simply have failed to demonstrate that any impermissible line has yet been crossed. Again, we emphasize that the "system" that ultimately led to the sales must be viewed in context. Appellants have pointed to no religious group that has been refused the chance to develop in Area I. Indeed, a Latino Pentecostal Church was given the opportunity to do so. Under these circumstances, we decline to hold that the "primary effect" of the City's actions was to advance Hasidic Judaism. Rather, under a neutral system that was designed to develop urban renewal land, it just so happened that one particular group had the resources to take advantage of development opportunities. That does not constitute a violation of the first amendment. "[R]eligious institutions need not be quarantined from public benefits that are neutrally available to all." Roemer, supra, 426 U.S. at 746, 96 S.Ct. at 2344 (upholding grants to private institutions of higher learning). In Mueller v. Allen, 463 U.S. 388, 401, 103 S.Ct. 3062, 3070, 77 L.Ed.2d 721 (1983), the Supreme Court recently stated that: "We would be loath to adopt a rule grounding the constitutionality of a facially neutral law on annual reports reciting the extent to which various classes of private citizens claimed benefits under the law" (holding tax deductions for educational expenses did not violate establishment clause, even though petitioners claimed application of statute primarily benefited religious institutions).
 
 
 98
 This would be a much closer case if the City had sold, for example, every single parcel of urban renewal land in Brooklyn to the Satmars for development of religious institutions. In such a case, even if that Congregation were the only group with resources to purchase, the overall impact of such one-sided land disposition to a group might well implicate the first amendment. In our case, however, the properties in question were sold according to standard, non-discriminatory practices; even the "cumulative effect" of the sales has not reached the proportions of a first amendment violation. We recognize that "[t]he problem, like many problems in constitutional law, is one of degree." Zorach, supra, 343 U.S. at 314, 72 S.Ct. at 684. We leave for another day, however, resolution of a case that may be closer to the line.
 
 
 99
 We hold that the primary effect of the municipal appellees' Area I land transfers, particularly the Site 4 transfer, was not to advance Hasidic Judaism.
 
 C. EXCESSIVE ENTANGLEMENT
 
 100
 The issue of excessive entanglement need not detain us long. We are in complete accord with the district court's conclusion that this case does not raise the specter of excessive entanglement. As the court explained, "the concept of 'entanglement' in violation of the First Amendment has to do with continuing involvement of government with religious organizations. The completed sale of Site 4 does not constitute an on-going relationship between the City and the Academy." Cf. Lemon, supra, 403 U.S. at 620-22, 91 S.Ct. at 2114-116 (detailing surveillance measures required to ensure that state funds were not used for indoctrination).
 
 
 101
 Appellants' entanglement argument rests primarily on their assertion that the land transfers violate restrictive covenants, which apparently are a feature of all City urban renewal property. The covenants forbid discrimination based upon "race, sex, color, creed or national origin...." Appellants speculate that "public officials will ... be required to make continual judgments regarding compliance with the covenants." The City's duty to monitor compliance with the covenants, however, poses no greater danger of excessive entanglement with the Satmar Congregation than it would with any other religious organization. We agree with the City that the right to sell urban renewal land to religious institutions for religious uses requires the common sense application of the non-discrimination covenants. See Fishman v. City of Stamford, 159 Conn. 116, 127, 267 A.2d 443, 449 (interpreting similar covenant in context of redevelopment plan; "[t]he only construction which may be reasonably placed on the restriction is that the type of discrimination as to creed ... was discrimination above and beyond that ordinarily and necessarily associated with, and incidental to, the operation of a church, such, for instance, as discrimination in the hiring of lay personnel as maintenance employees"), cert. denied, 399 U.S. 905, 90 S.Ct. 2197, 26 L.Ed.2d 560 (1970). Otherwise, the City arguably would never be permitted to sell land to religious organizations, most of which, on some level, "discriminate" on the basis of religion (and many of which prescribe different roles to men and women and thus arguably practice gender discrimination).
 
 
 102
 Appellants also point to the political divisiveness of the sales as evidence of entanglement. Although friction between the Hasidim and other members of the Brooklyn community is an unfortunate political reality, the fact that the sale to the Satmar Congregation has been politically divisive is not alone sufficient evidence of entanglement. As the Supreme Court stated in Lynch, supra, that Court "has not held that political divisiveness alone can serve to invalidate otherwise permissible conduct." 465 U.S. at 684, 104 S.Ct. at 1365. Indeed, since this case, like Lynch, does not involve a "direct subsidy" to religious institutions, "no inquiry into potential political divisiveness is even called for." Id.
 
 
 103
 We hold that the land transfers here involved do not reflect excessive entanglement.
 
 V.
 
 104
 We turn next to appellants' claim with respect to equal protection. We hold that the district court properly rejected their claim of intentional discrimination, for substantially the reasons set forth in the district court's comprehensive analysis of this claim.
 
 
 105
 As we have previously stated, in order to prove discrimination in violation of the equal protection clause, "plaintiff must show not only that the state action complained of had a disproportionate or discriminatory impact but also that the defendant acted with the intent to discriminate." Yonkers Bd. of Educ., supra, 837 F.2d at 1216 (emphasis added).
 
 
 106
 The district court found that "City officials were doubtless aware of the practices of the Hasidim. Their distinctive customs ... are apparent to those who work with them and perhaps to a large degree are a matter of public knowledge in the City." We need go no further than what we said in Parents' Association v. Quinones, supra, 803 F.2d at 1241, for evidence of the group's "separatist beliefs...." As the district court pointed out, however, awareness of a discriminatory effect is not dispositive of the inquiry regarding intent. Rather, " '[d]iscriminatory purpose' ... implies ... that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Administrator v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (citation omitted) (holding that absolute lifetime preference to veterans did not discriminate against women in violation of the equal protection clause). Accordingly, the district court held that "[t]o succeed plaintiffs must show that the City officials sold the property to the Hasidim because they would segregate themselves from non-Hasidim."
 
 
 107
 The district court properly addressed the factors for determining discriminatory intent articulated by the Supreme Court in Arlington Heights v. Metropolitan Housing Development Corporation, 429 U.S. 252, 266-68, 97 S.Ct. 555, 563-65, 50 L.Ed.2d 450 (1977), a case in which the Court found that the respondents had failed to carry their burden of proving that discriminatory purpose was a motivating factor in a village's decision not to re-zone a parcel of land to permit multiple-family dwellings. The relevant factors include (1) the degree of any discriminatory effect of the action, (2) its historical background, (3) the sequence of events that led to the action, (4) the presence or absence of departures from normal procedures or substantive criteria, and (5) the legislative or administrative history of the action.
 
 
 108
 Looking first at the question of effect, the district court determined that
 
 
 109
 "[w]hatever discriminatory effect the City's actions have had, they have not created the Hasidic enclave that plaintiffs envisage. The majority of housing units in Area I are integrated...." Indeed, this fact seriously undermines not only appellants' fourteenth amendment claim, but their first amendment claim as well. Appellants' suggestions to the contrary, Area I by no means has been limited to development that benefits only the Hasidic community. When one goes beyond Site 4, it is evident that other groups have benefited. For example, the first buildings constructed in Area I were 2,350 low and moderate income housing units, to replace the 1,400 deteriorated dwellings that existed prior to urban renewal. With the exception of the planned developments involved in this case, there is only one Satmar yeshiva and no Satmar synagogue in Area I. Finally, it bears repeating, again, that a Latino Pentecostal Church was given the opportunity to locate in Area I, but chose not to do so.
 
 
 110
 Even though sales at market rate had been made to primarily the Hasidim, and thus "there may well be some segregative result," the district court stated that it was constrained to consider the alternatives available to the City in making land disposition decisions. See Feeney, supra, 442 U.S. at 283, 99 S.Ct. at 2298 (Marshall, J., dissenting). Here, the court relied on the critical fact that no minority group or non-Hasidic organization had come forward with alternative development proposals for the parcels purchased by the Academy, even though non-Hasidim had not been barred from making proposals. The district court stated it well:
 
 
 111
 "The Constitution does not require the City to restrict the types of housing in the area to subsidized housing. This might tend to foster segregated neighborhoods. Nor does the Constitution require the City to leave institutional parcels vacant because a non-Hasidic organization[ ] cannot be found to develop them.
 
 
 112
 Plaintiffs suggest that instead of selling to Jewish interests the City should have reserved more land in Area I for parks or manufacturing. The plan does provide for these uses, and plaintiffs have not shown that the amount of such land is constitutionally inappropriate or so inadequate as to evidence a hidden intent to discriminate against them."
 
 
 113
 Dealing with appellants' claim that the "sole source policy" of the 1970s and early 1980s (which has subsequently been changed) invites suspicion that discriminatory designations were made, the court concluded that it was satisfied from the testimony that HPD had made a "good faith effort" to seek out, on the merits, developers to implement the Urban Renewal Plan. "Moreover", as the court stated, "the criteria used by the City in making designations under the sole-source policy appear rational and not invidiously discriminatory." The court termed "sensible" the designation of previously established organizations which formerly had succeeded in development projects. Furthermore, the court emphasized again that appellants' argument would be more tenable "[h]ad others sought to develop Site 4 for institutional ... use and been denied the opportunity.... No such persons appeared at any stage."
 
 
 114
 With respect to the alleged "departure from normal procedure" regarding the decision not to re-ULURP, the court found that appellants had not established that the City attorney's advice that such a step was unnecessary was faulty. See Starburst Realty Corp. v. City of New York, 125 A.D.2d 148, 156, 512 N.Y.S.2d 60, 65-66 (1st Dep't), motion for leave to appeal denied, 70 N.Y.2d 605, 513 N.E.2d 1308, 519 N.Y.S.2d 1028 (1987) ("The statutory scheme establishing community boards and authorizing non-binding recommendations on the part of those boards does not preclude the ultimate adoption of contracts containing different, even substantially different, terms from those found in the proposals originally considered under ULURP.... It is the Board of Estimate ... which has the 'final authority respecting the use, development and improvement of city land.' (N.Y.City Charter 67"). The court observed that the Community Board's ULURP Committee ultimately approved the conveyance. The court found "no basis for plaintiffs' accusations that the City accomplished the sale of Sites 4A and 4B through a devious 'sleight-of-hand' or by departing from normal procedural standards."
 
 
 115
 With respect to the cross subsidy agreement, which appellants claim would segregate Latinos in subsidized housing in Area II and thus was a product of a discriminatory motive, the court found, based largely on the testimony of former Commissioner Anthony Gliedman, that the cross subsidy agreement was conceived "not to discriminate against Hispanics but as a practical way to help them achieve the goal they sought." This finding is supported by the record.
 
 
 116
 The court rejected the argument that the cumulation of all the City's decisions with respect to Site 4 lead to an inference of discrimination against Latinos and in favor of the Hasidim. In this section of its opinion, the court detailed a long history of community members' supporting the proposed sale to the Academy.
 
 
 117
 In 1979, "the Community Board members, presumably a cross-section of the community, voted after public hearings unanimously to approve the dispositions to the Academy." The Planning Commission and BOE held hearings and approved the sale in 1979. "There is no evidence that anyone came forward to object at any of these hearings." These are significant findings by the district court.
 
 
 118
 In 1984, the Community Board, at a public hearing, focused on the sale of Sites 4A and 4B to the Academy for a boys' yeshiva and faculty housing. The sale was approved. The Planning Commission also held a hearing. At that hearing, a representative of the Community Board urged approval of the proposal, as did a spokesman for the largely Latino Epiphany Church, who presented a petition with 1100 signatures. Again, as the court found, "[t]here is no evidence that anyone appeared in opposition" to the proposal, and the Planning Commission approved it. The BOE also approved it after a hearing, at which again "[n]o one appeared in opposition...."
 
 
 119
 Finally, in 1988, the ULURP Committee of the Community Board considered the question of the Academy's construction of the synagogue, yeshiva, and faculty housing. The Committee approved the proposals and sent a copy of its recommendation to the Mayor, over the signatures of the chairmen of the Committee and the Community Board. Again, as the court found, "[n]o one appeared in opposition at the hearing held by the Board of Estimate."
 
 
 120
 Considering the history of the proposal's somewhat tortuous route through various channels of community and municipal review, the court concluded that:
 
 
 121
 "The choice of the Academy to develop Site 4 apparently did not arouse significant opposition at any point after that first designation in 1977. As far as the record shows, no one ever throughout the years alerted the Board of Estimate, the ultimate decision maker, to the possibility that the sale was, at least in part, based upon an intent to discriminate or even had the effect of discriminating in favor of Hasidim and against Hispanics. It is hard to attribute an invidious motive to the Board of Estimate when no one suggested to it that such a motive was at work in the pertinent agencies, the Community Board, or the Planning Commission."
 
 
 122
 We decline to set aside the court's thoughtful conclusion that there was no discrimination at work here, a conclusion which, far from being clearly erroneous, is amply supported by the record. Nor do we agree with appellants that the court applied the wrong legal standard in assessing their discrimination claim. While appellants focus on the court's statement that there was no "admissible direct evidence" of discriminatory intent and that the court would not consider "inadmissible hearsay and rumors," it is clear from a review of its careful opinion on this issue that the court recognized that discriminatory intent can be shown through circumstantial evidence. See Arlington Heights, supra, 429 U.S. at 266, 97 S.Ct. at 564 ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."). In reaching its conclusion, the court properly relied on a number of compelling factors: the City's actions have not created an exclusively Hasidic enclave, since the majority of the housing units in Area I are integrated; no minority group developer or non-Hasidic organization came forward with alternative proposals; the sales have gone through a lengthy process of approval; the Site 4 proposals never aroused any significant opposition; and the standards used for the designation of developers were not discriminatory.
 
 
 123
 We hold that the court properly rejected appellants' equal protection claim.
 
 VI.
 
 124
 This brings us to appellees' laches argument, which, while not explicitly considered by the district court, follows naturally upon the heels of our discussion of the court's findings with respect to the length and extent of community involvement in the land dispositions involved in this case. We hold that laches provides an alternative basis for rejecting appellants' claims.
 
 
 125
 To prove laches, a party asserting the defense must show (1) lack of diligence by the party against whom the defense is asserted and (2) prejudice. Costello v. United States, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961). Laches can bar constitutional claims. Soules v. Kauaians for Nukolii Campaign Comm., 849 F.2d 1176, 1181-82 (9 Cir.1988) (laches barred equal protection claim); Gay Men's Health Crisis v. Sullivan, 733 F.Supp. 619, 631 (S.D.N.Y.1989) (suggesting that, in appropriate circumstances, laches could bar first amendment claims).
 
 
 126
 In the instant case, the court's findings provide ample support for the conclusion that appellants inexcusably dragged their heels:
 
 
 127
 "During all the years when Site 4 appeared on calendars for public hearings the identity of the Academy as an Hasidic organization was well known. Moreover, the dogma and practices of the Hasidim were not secrets discovered only after the final conveyance had been made to the Academy.
 
 
 128
 Several law suits brought by Hispanics had made that dogma and those practices, as well as the propensity of the Hasidim to remain separate from the rest of society, a matter of public record. The Hispanics had not been loathe to protest publicly what they regarded as an infringement on their civil rights in favor of Hasidim." (citations omitted).
 
 
 129
 In this case, however, far from publicly protesting during the years of community participation that preceded ultimate disposition, the Latino community largely supported the Academy's plans or stood mute--until quite recently.
 
 
 130
 Appellants would have us believe that they were effectively "shut out" of the review process. Their specific claims in this regard, however, are more than a little disingenuous. For example, appellants excerpt in their brief, at some length, a letter sent by the Community Board expressing concern about the failure to consult them regarding the changed institutional uses for Site 4:
 
 
 131
 "We were, thus, shocked, when on July 13, 1988, we fortuitously learned that 'institutional use' now meant a 6,000 seat synagogue (probably the largest public assembly hall in Brooklyn!), a school with 30 classrooms, and 68 units of faculty housing and, that the sale of this property would be approved by BOE on the very next day!"
 
 
 132
 Immediately following the excerpted letter, appellants state in their brief that the "deed was subsequently executed and the [Academy] became the owner and developer of all three parcels on site 4." Appellants conveniently leave out, however, a critical middle step: the submission of the final proposal by the HPD to the Community Board for comments and a recommendation. About 30 people attended a July 25, 1988 Community Board ULURP Committee meeting and approved the proposal. The Committee found that the sale was consistent with the Urban Renewal Plan, would provide cross subsidy money and would not negatively impact the surrounding community. On August 10, 1988, the Chairmen of the Community Board and ULURP Committee wrote a joint letter to the Mayor enclosing a copy of the full Committee recommendation. The City did not make this land disposition without community input.
 
 
 133
 Furthermore, leaving aside the question of prior input, the Community Board learned of the ultimate proposal, according to the terms of its own letter, no later than July 13, 1988. The Academy held a groundbreaking ceremony on the site in October 1988 and erected a sign on the property with a picture of the proposed synagogue. Still, for many months, appellants essentially stood mute. The precise date when various community members learned of the Academy's precise plans is a matter still disputed by appellants, but it is a dispute we need not resolve. After the groundbreaking, appellants waited more than fourteen months to commence this lawsuit--after more than ten years of no opposition to the Academy's developing plans. Appellants have not been diligent. Their past protracted silence and even tacit approval during years of public hearings now serve to undercut their credibility and tip the balance of equities against them.
 
 
 134
 As for prejudice to the Academy, it is manifest. The court expressly found that the Academy has spent about two and a half million dollars to develop Sites 4A, 4B, and 4C. Since October of 1988, when the synagogue sign went up, it has engaged in substantial fund raising efforts to develop Site 4. It has raised about three million dollars and has about six million dollars in commitments. Thus, while appellants sat passively by, the Academy acted diligently in developing the land and, at this stage, would be profoundly prejudiced were injunctive relief to be granted. An injunction would cause the Academy significant financial loss.
 
 
 135
 We hold that an alternative ground for affirming the district court's denial of injunctive relief is that of laches.
 
 VII.
 To summarize:
 
 136
 We hold that appellants have standing. Their first amendment claims were properly analyzed within the framework of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), as the Lemon test has been given content by later Supreme Court decisions. We hold that the City's sale of land to the Hasidic community did not violate the first amendment; there was a secular purpose, the primary effect was not to advance religion, and the sale will not lead to excessive entanglement by the government with the affairs of the Satmar Congregation. Appellants also failed to establish that the sales were discriminatory in violation of the equal protection clause. An alternative basis for rejecting appellants' claims, and for affirming the district court's denial of injunctive relief, is provided by the doctrine of laches.
 
 
 137
 Affirmed.