JOSEPH FISHMAN *v.* CITY OF STAMFORD ET AL.

KING, C. J., ALCORN, HOUSE, THIM and RYAN, Js.

Argued December 3, 1969—decided February 3, 1970

*Sidney C. Kweskin,* with whom was *Stephen M. Seelig,* for the appellant (plaintiff).

*Robert M. Wechsler,* for the appellees (defendants).

KING, C. J. The plaintiff is the owner of a small parking lot which is within the redevelopment area in Stamford covered by the "Southeast Quadrant Redevelopment Plan Extended". The plan was adopted on February 20, 1963, by the Urban Redevelopment Commission of Stamford, hereinafter referred to as U.R.C. There is no claim that proper statutory procedure was not in all respects followed in the adoption of the plan in 1963. A public hearing on the plan was held on January 15, 1963, and it was approved by the Board of Representatives of Stamford on March 4, 1963. The plan embraces the entire downtown Stamford area, comprising about 130 acres, and of a total of 550 structures on the land involved, 424 will be demolished.

The plaintiff's land is an interior parcel, contiguous, on the north and west, to property also within the redevelopment area belonging to St. John's Roman Catholic Church, hereinafter referred to as the church. On the other two sides, the plaintiff's land is bounded by rights of way. Its area is about 10,000 square feet, or slightly less than one-quarter of an acre. Two old shacks are the only buildings on it.

The original redevelopment plan provided, inter alia, for the building of 100 to 150 units of nonprofit moderate income housing on land which was to be taken from a portion of the church property presently used as a convent but which was to be replaced by other contiguous land so as to avoid materially reducing the area of the church's holdings. Certain questions arising out of this exchange of land with the church are attacked on grounds which will hereinafter be more fully considered in part II of this opinion.

Although the plaintiff's property was within the 1963 redevelopment area, U.R.C. had not originally intended to acquire it and had consequently marked it on the plan as "not to be acquired", the same action it had taken in the case of certain other properties which it felt could suitably remain unchanged although they were located within the redevelopment area. Since the plaintiff's property was within that area, it was subject to the controls of the plan, as the plaintiff must have known.

On May 25, 1965, U.R.C. decided that it was necessary to increase, by more than 100 percent, the units of moderate income housing from the original number shown in the 1963 plan to not less than 350 units. This in turn required modifications in height and density limitations and also more land from the church. On November 30, 1965, U.R.C. voted to take the plaintiff's property, and on October 14, 1966, the plan was modified to include the plaintiff's parking lot as property to be taken for reuse.

I

The plaintiff makes two basic claims of illegality with respect to the modification of the plan to provide for the taking of his property. The first is that

U.R.C. did not act in accordance with the statutory requirements when it changed the plan to take the plaintiff's property, and the second is that, if statutory requirements purported to permit such a taking, they were, at least as to the plaintiff, unconstitutional in that his property was being taken without due process of law in violation of the fourteenth amendment to the United States constitution and of article first, § 10, of the Connecticut constitution of 1965.

(a)

The plaintiff claims that, once the 1963 plan had been properly approved in accordance with § 8-127 of the General Statutes (Rev. to 1966), any change in that plan, and in particular the change in removing the plaintiff's property from the "not to be acquired" category and actually taking it for reuse, in effect amounted to the adoption of a new plan of redevelopment and required compliance with all of the provisions of § 8-127 applicable to the adoption of an original redevelopment plan.

This claim is without merit. It completely ignores General Statutes (Rev. to 1966) § 8-136, which provides for modification of a redevelopment plan. Under its provisions, if "the proposed modification will substantially change the redevelopment plan as previously approved [under § 8-127] by the legislative body, the modification must similarly be approved by the legislative body". Whether the taking of the plaintiff's property "will substantially change" the 1963 redevelopment plan is a matter which need not be determined in the present case since U.R.C., out of abundance of caution, did submit the proposed modification to the legislative body, which in Stamford is the Board of Representatives,

and, on December 5, 1966, that body approved the modifications.

It is true that "[s]trict compliance with each of the enumerated steps in the statute [§§ 8-127 and 8-136] is a condition to the validity of the entire proceeding concerning a redevelopment plan. . . . The rule applicable to the corporate authorities of municipal bodies [here, U.R.C.] is that when the mode in which their power is to be exercised is prescribed, that mode must be followed." *Sheehan* v. *Altschuler*, 148 Conn. 517, 523–524, 172 A.2d 897. Here, however, the plaintiff makes no claim that the 1963 plan was not adopted in accordance with all the statutory requirements, including those of § 8-127. The modification of the plan in 1966 was also in strict accordance with the provisions of § 8-136. The plaintiff's claim that the modification of the original plan so as to take the plaintiff's parking lot was invalid because of failure to follow the applicable statutory procedure is without semblance of merit.

(b)

The second claim of the plaintiff, and that on which he seems to place great stress, is that, even if the statutory requirements were followed, they were inadequate to conform to the requirements of due process insofar as the taking of the plaintiff's land under the facts of this case are concerned.

The plaintiff points to the fact that the legend "not to be acquired" on the map covering the 1963 plan led him to believe that his property would not be taken. Prior to the U.R.C.'s decision in 1965 to modify the plan, it is probably true that neither the plaintiff nor the U.R.C. itself anticipated that the parking lot would be taken. It was the increased need and demand for moderate rental housing, aris-

ing after 1963, which led the U.R.C. to modify the plan and, as incidental thereto, to take the plaintiff's property. The plaintiff claims that due process requirements made necessary a hearing on the necessity and legality of the taking before the taking actually became final. This claim is contrary to settled Connecticut law since at least as far back as *Water Commissioners* v. *Johnson,* 86 Conn. 151, 162, 84 A. 727, decided in 1912. It is also contrary to the general rule elsewhere. 1 Nichols, Eminent Domain (Rev. 3d Ed.) § 4.103[4], p. 504; 26 Am. Jur. 2d 769, Eminent Domain, § 112.

It is true, of course, that the condemnee in a redevelopment case may secure a judicial review of the necessity and legality of the taking and has the opportunity of alleging and proving its illegal character in any of the respects alleged, and if he sustains his burden of proof he may secure injunctive relief. *Bahr Corporation* v. *O'Brion,* 146 Conn. 237, 246, 149 A.2d 691; *Gohld Realty Co.* v. *Hartford,* 141 Conn. 135, 146, 104 A.2d 365; see also *State* v. *Fahey,* 147 Conn. 13, 17, 156 A.2d 463.

There is no claim that the plaintiff was not informed of the modification under the provisions of General Statutes § 8-129 until it was too late to institute a judicial attack. Indeed he did invoke an attack in this very proceeding, in which the necessity and legality of the taking is open to review, and is being reviewed, on the statutory and due process grounds heretofore set forth, as well as on the other grounds hereinafter discussed in part II of this opinion.

## II

The remaining claims of the plaintiff are concerned with the proposed use of his property for

church purposes. They are (1) that for the U.R.C. to sell the plaintiff's property to the church at the so-called "re-use price", which would be admittedly lower than the price the church was paid for substantially similar land sold by it to the U.R.C., would be a direct aid to religion and thus would constitute a violation of the establishment clauses of the constitution of the United States (first amendment) and of the constitution of Connecticut (article seventh); (2) that the taking of the plaintiff's property in order to devote it to a church use is an illegal taking for a private purpose; and (3) that the land cannot be taken and sold to a church because necessarily the church will violate a redevelopment requirement, hereinafter more particularly discussed, forbidding discrimination on the basis of creed.

As already pointed out, the 1966 modification of the original plan necessitated the taking of an additional parcel of land from the church. In order that the church receive an amount of land substantially equal to that which was taken from it, about 10,000 square feet of additional land was needed. The plaintiff owned a parcel of land of that size which adjoined the church property. Thus, the U.R.C. made its decision to take the plaintiff's property. The basic purpose, of course, was to increase the number of moderate income housing units to be constructed but to retain them in the same general area, and to do both without displacing the church plant which the plan expressly contemplated should continue to function in that area.

Before we proceed to the plaintiff's foregoing grounds of appeal, it is desirable to discuss one ruling on evidence. During the trial, the plaintiff sought to elicit testimony from a witness as to the price which the church had received for land it had

transferred to the U.R.C. The plaintiff's claim for the admissibility of the answer was that it would be a step in showing that the church was to receive land at a lower price than it had been paid for the land it had given up. The court sustained an objection and excluded the question. There was no harmful error in the ruling because, as the court pointed out, it has at all times been an admitted fact that the church, or any other person or entity, would pay a lower price for land it received than it was paid for comparable land it gave up. The answer, if given, would have been merely evidence tending to prove a fact already admitted. The ruling could not have been harmful.

We turn to the first of the plaintiff's basic claims on this branch of the case, which is that the difference between the fair value paid the church for the land taken from it and the amount to be paid by the church for the reuse property which it will receive is a direct grant to the church and is a violation of the United States and Connecticut constitutions. In his brief and argument, the plaintiff characterizes this difference as a "cash boot" to the church. Thus, the plaintiff's claim becomes not so much a challenge to the taking of his particular piece of property as a challenge to the constitutionality of the plan insofar as it will result in the church receiving this so-called "cash boot". There is no doubt that a redevelopment agency can create "a balanced, integrated plan . . . including not only new homes but also schools, churches, parks, streets, and shopping centers." *Berman* v. *Parker*, 348 U.S. 26, 34, 75 S. Ct. 98, 99 L. Ed. 27. Thus, the mere fact that a plan, as was the case here, provides for the retention of a church plant in a given area does not render that plan unconstitutional. Indeed, the plaintiff does

not expressly make such a claim. Rather, he claims that the "cash boot" received by the church is government aid to religion, and he then goes on to discuss cases involving the constitutionality of government aid to religion, such as *Abington School District* v. *Schempp*, 374 U.S. 203, 83 S. Ct. 1560, 10 L. Ed. 2d 844, and *Snyder* v. *Newtown*, 147 Conn. 374, 161 A.2d 770. These cases have no application to the present case. The church gave up certain property at fair value and will pay for additional property, subject to reuse restrictions, at its fair value. Fair value will obviously be greater in the case of property given up than for comparable property received but only because any property received would be subject to such reuse restrictions, running with the land, as to reduce its fair value. This has nothing to do with the fact that a church is involved. Without a showing that the church was given some unduly favorable price on the land it gave up or received so that fair value was not followed, and no such claim is made in the pleadings, it cannot be said that there has been any aid to religion.

This same issue was faced in *64th St. Residences, Inc.* v. *New York*, 4 N.Y.2d 268, 275, 150 N.E.2d 396. There Fordham University, a denominational institution, purchased lands from the city of New York at a price considerably lower than the city had paid for them. The court decided, however, that there was no substance to the argument that Fordham was receiving any governmental aid. This was because the land it received was subject to certain restrictions and obligations, which were binding on Fordham, under the terms of the applicable urban renewal plan.

The plaintiff's second claim is that restriction of the reuse of the plaintiff's property to church pur-

poses makes the original taking one for a private rather than a public purpose. Of course, there is no right to condemn land for a private purpose, but it is much too late for the plaintiff to argue that the taking of property by a redevelopment agency pursuant to a plan to alleviate blight and the subsequent sale of that land to private redevelopers is a taking for a private use. It has long been settled that, when, as in the instant case, the redevelopment agency formulates a plan for the alleviation of blight and takes land pursuant to that plan, it is taking land for a public purpose, namely, the rehabilitation of the area. This public purpose is not affected by the agency's subsequent resale of the property to private redevelopers with the requirement, under General Statutes (Rev. to 1966) § 8-137, that the land be used according to the redevelopment plan. *Gohld Realty Co.* v. *Hartford,* 141 Conn. 135, 143, 104 A.2d 365; *Barnes* v. *New Haven,* 140 Conn. 8, 19, 98 A.2d 523; *Berman* v. *Parker,* 348 U.S. 26, 32, 75 S. Ct. 98, 99 L. Ed. 27; 2 Nichols, Eminent Domain (Rev. 3d Ed.) § 7.51561.

The plaintiff's third and final claim is that the church cannot possibly take and use the plaintiff's property without violating a proposed agreement with U.R.C. which the plaintiff claims will provide, inter alia, that the church shall not discriminate, in the use of the land received back from the U.R.C., on the basis of race, creed, color or national origin. Such an agreement is required, under the plan, in the case of property purchased for reuse. The plaintiff does not describe exactly how the church will discriminate but claims that a church by its very nature will discriminate on the basis of creed in the use of its property.

In the first place, the claim is anticipatory because

the U.R.C. and the church have not yet entered into the contract, and the plaintiff has not established what facilities of the church will be placed on the plaintiff's property if and after the U.R.C. transfers it to the church.

It was part of the redevelopment plan that the church be kept in the downtown area. Under the plaintiff's theory, such a plan requiring the taking of the plaintiff's property for reuse by the church could not be carried out since a church making a normal use of its property would be necessarily making a use discriminatory on the basis of creed. The reasoning of the plaintiff is more ingenious than persuasive.

The pastor, called as a witness, said that any property received back would not be utilized in a discriminatory manner, and the court, in accordance with that testimony, failed to find that the plaintiff had established that there would be any discrimination in the proposed use of the parking lot property.

We cannot adopt the plaintiff's contention that we must hold that regardless of any testimony or other evidence the church will not, or in law cannot, carry out an agreement with U.R.C. forbidding discrimination on the basis of creed in the use of the plaintiff's property when and if it is received from the U.R.C. To accept the plaintiff's argument that the use of land for church purposes is necessarily using it in a manner discriminatory as to creed would render the plan, as well as the proposed contract, self-contradictory and meaningless.

The restriction in the plan prohibiting discrimination based upon race, creed, color or national origin would be entirely reasonable and workable in most reuse contracts such, for instance, as a contract for reuse of land for mercantile, business, industrial or

even residential purposes. Here, the restriction is reasonable and workable except for discrimination on the basis of creed, and the difficulty here arises only because the reuse is restricted to church purposes. It is obvious that in the light of the circumstances actually prevailing in this particular situation, the expressed intent of the plan could not reasonably be that which the plaintiff claims. Although it is the expressed intent which must control, that is to be determined in the light of the situation of the parties and the circumstances connected with the transaction, including, of course, the fact that the contemplated resale of the plaintiff's land is to the church. *Sturtevant* v. *Sturtevant*, 146 Conn. 644, 647, 153 A.2d 828. The only construction which may be reasonably placed on the restriction is that the type of discrimination as to creed which the U.R.C. sought to forbid on the part of the church was discrimination above and beyond that ordinarily and necessarily associated with, and incidental to, the operation of a church, such, for instance, as discrimination in the hiring of lay personnel as maintenance employees.

Part of the difficulty of the plaintiff's argument stems from its anticipatory nature. If and when a contract between the U.R.C. and the church is finally made, and if and when the church acts in such a way as to breach any term of that contract as it may be finally worded, the U.R.C., under General Statutes (Rev. to 1966) § 8-137, has its remedy in appropriate legal action. We cannot hold that such a breach must occur regardless of what use the church makes of the property. Much less can we presume that if a breach should occur U.R.C. would make no effort to take appropriate action.

One final ruling on evidence perhaps merits dis-

cussion. In attempting to prove that the church will discriminate in its use of the land, the plaintiff questioned its pastor as to the type of prayer or worship which would take place in the convent. The question was objected to as irrelevant, and the objection was sustained. The question was irrelevant because it had not been established that the property in question would be used for convent purposes. Thus, the plaintiff's question, if it went to the issue of discrimination at all, did not go to the issue of discrimination in the reuse of the plaintiff's land. We find no error in this ruling.

There is no error.

In this opinion the other judges concurred.