[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In May of 1997, the plaintiffs, Avalonbay Communities, Inc. (Avalonbay) and Ernest Cuzzocreo entered into a contract whereby Avalonbay was to purchase some 9.6 acres of property owned by Cuzzocreo. The 9.6 acres (hereinafter referred to as the "site") was located, at the time of the purchase agreement, in a light industrial district which specifically allowed therein a planned residential development (PRD), which include affordable housing projects in accordance with Connecticut General Statutes §8-30.
Subsequently, in August of 1997, Avalonbay filed an application for a permit and a site plan approval to build on the site a luxury apartment complex, a percentage of which would qualify as affordable housing rental units. The Orange Planning and Zoning Commission denied this application as well as Avalonbay's subsequent revised application.[1] The PZC, some three weeks after Avalonbay's application was filed, issued a moratorium on all PRDs in Orange.[2]
While Avalonbay's appeal from the decision of the PZC was pending, the Orange Economic Development Commission ("the Orange Commission"), in April, 1998, hired the planning firm of Decarlo Dahl to draft a project plan for a hi-tech industrial park that would occupy 18 separate parcels of land on an 172 acre plot in Orange. Avalonbay's proposed site was included in this total acreage.
In September, 1998, the Orange Economic Development Corporation ("Orange Corporation"), a private corporate entity was formed to oversee the proposed industrial park. Plans were also formed to take the site property by eminent domain. On November 3, 1998, however, the voters of the Town of Orange rejected the proposed issuance of bonds for the acquisition of the site.
The project plan, however, continued. In February, 1999, the project plan was approved by the town selectmen for Orange. At this time, the plan to take the site by eminent domain was revived and approved by the Commission on March 9, 1999. The CT Page 1808 Selectmen voted the next day to condemn the site. A town meeting on March 29, 1999, followed the selectmen's vote and approved the taking of the Avalonbay site by eminent domain for inclusion in the industrial park project.
Avalonbay and Cuzzocreo filed an application for an injunction to stay the condemnation of the site. The application consisted of five counts: the first two counts seeking a permanent injunction against the project plan and the taking of the site by eminent domain, and the latter three seeking damages against the defendants, the Town of Orange and numerous individual defendants, based on the Fair Housing Act, tortious interference and indemnification. The court, issued a stay on the condemnation pending the resolution of the plaintiff's application for an injunction. This court subsequently entertained the application for injunction over a several month period during which both parties produced numerous exhibits and witnesses in support of and against the injunction.
"It is clear that the power of equity to grant injunctive relief may be exercised only under demanding circumstances." (Internal quotation marks omitted.) Anderson v. Latimer PointManagement Corp. , 208 Conn. 256, 262, 545 A.2d 525 (1988). "[T]he issuance of an injunction rests within the sound discretion of the trial court. . . . In exercising its discretion, the court, in a proper case, may consider and balance the injury complained of with that which will result from the interference by injunction." (Citations omitted; internal quotation marks omitted.) Id.
"[A] party seeking injunctive relief has the burden of alleging and proving irreparable harm and the lack of an adequate remedy at law." (Internal quotation marks omitted.) Branch v.Occhionero, 239 Conn. 199, 207, 682 A.2d 306 (1996). "Injunctive relief may not lie where it is predicated on the fears and apprehensions of the party applying for it or where it would be incompatible with the equities of the case. . . ." (Citations omitted.) Karls v. Alexandra Realty Corp. , 179 Conn. 390, 402,426 A.2d 784 (1980). "The extraordinary nature of injunctive relief requires that the harm complained of is occurring or will occur if the injunction is not granted." Id.
"Although an absolute certainty is not required, it must appear that there is a substantial probability that but for the issuance of the injunction, the party seeking it will suffer irreparable CT Page 1809 harm." Id. "Whether damages are to be viewed by a court of equity as `irreparable' or not depends more upon the nature of the right which is injuriously affected than upon the pecuniary measure of the loss suffered." Emhart Industries, Inc. v. Amalgamated LocalUnion 376, 190 Conn. 371, 402, 461 A.2d 422 (1983).
Injunctive relief is an appropriate remedy when challenging the taking of a property by eminent domain. Bahr Corp. v. O'Brion,146 Conn. 237, 149 A.2d 691 (1959). "The decision of the condemnor that a necessity exists for the taking of particular property is one open to judicial review to discover if it was unreasonable, or in bad faith, or an abuse of the power conferred, and . . . the appropriation of the property will be restrained if it is found that such was the character of the decision. . . ." (Citations omitted; internal quotation marks omitted.) Id., 250.
Avalonbay's[3] application for injunction challenges Orange's stated public purpose of the industrial park plan in general and the condemnation of the site in particular. Avalonbay argues that the taking of the site for an industrial park is not a sufficient public purpose and, in any event, is not necessary for the completion of the park. Avalonbay maintains that the proposed industrial park is the equivalent of a private taking that will benefit select private individuals, ie. the developers of the project and the subsequent corporations that will receive the benefits of the municipality's taking of land. Moreover, Avalonbay argues that the site is already devoted to a public purpose, affordable housing, which cannot be preempted by Orange's current plan. Finally, Avalonbay argues that Orange's condemnation of the site is motivated by improper motives and bad faith and merely a pretext in Orange's attempt to keep affordable housing from the site.
Orange disputes Avalonbay's assertions and maintains that the land described in the project, including the site, is the last available area in Orange for the development of a hi-tech industrial park that will increase the tax base and bring jobs to the community. Orange argues that plans for such an industrial park precede any plans for affordable housing and are consistent with the town and region's objectives of creating an industrial park. Moreover, Orange argues that the inclusion of the site in these plans is integral and necessary for the preservation of the very industrial zone which the proposed park is part of. CT Page 1810
The court will first address the issue of whether the industrial park plan is a public purpose for which the power of eminent domain may be used.
"It is fundamental that the state government or any properly designated agency thereof may take private property under its power of eminent domain, if the taking is for a public use and if just compensation is paid therefor." Gohld Realty Co. v.Hartford, 141 Conn. 135, 141, 104 A.2d 365. (Conn. Const., Art.I, 11); "A municipality can exercise the right of eminent domain only when it is conferred upon it by the legislature expressly or by necessary implication, since a municipal corporation has no more right than any other corporation to condemn property."Ulichny v. City of Bridgeport, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 228566 (June 25, 1993, Spear, J.), aff'd., 230 Conn. 140, 644 A.2d 347 (1994), citing, 11 McQuillan, Municipal Corporations, 3d Ed. rev. (32.12).
"In this State it is settled that public use means public usefulness, utility or advantage, or what is productive of general benefits; so that any appropriating of private property by the State under its right of eminent domain for purposes of great advantage to the community, is a taking for public use."Gohld Realty Co. v. Hartford, supra, 141 Conn. 141.
"A public use defies absolute definition, for it changes with varying conditions of society, new appliances in the sciences, changing conceptions of the scope and functions of government, and other differing circumstances brought about by an increase in population and new modes of communication and transportation. . . ." (Citations omitted.) Katz v. Brandon,156 Conn. 521, 532, 245 A.2d 579 (1968). "Courts as a rule, instead of attempting judicially to define a public as distinguished from a private purpose, have left each case to be determined on its own peculiar circumstances. Promotion of the public safety and general welfare constitutes a recognized public purpose. If the expenditure of public funds will promote the welfare of the community, it is for a public purpose. . . . The modern trend of authority is to expand and liberally construe the meaning of `public purpose.' The test of public use is not how the use is furnished but rather the right of the public to receive and enjoy its benefit." Id.
Connecticut courts have yet to opine as to whether the creation of an industrial park is a public purpose which justifies the use CT Page 1811 of eminent domain. While the Supreme Court has interpreted eminent domain in the context of redevelopment for purposes of business or industry, these pronouncements are based on scenarios that are factually inapposite to the present scenario. Thus, for instance, the Ghould and Katz cases address the condemnation of sites that are in economically blighted areas. While eminent domain in both of those cases was used to specifically remedy these urban blights, neither case addressed a situation, where, as in the present case, there is no evidence that the site is blighted but, on the contrary, suggests that the land (at least the site) is earmarked for new development and use.
Regarding this difference, it is noteworthy that cases from other jurisdictions suggest that the taking of land by eminent domain for a private business use is not a public purpose in cases where there is no evidence that the land in question is blighted. See Merrill v. City of Manchester, 499 A.2d 216 (N.H. 1985); see, Miller v. City of Tacoma, 378 P.2d 464 (1963). In those situations, however, where the character of the condemned land is not particularly focused on by the courts, there is a mixture of outcomes as to the public use of a project similar to the one at hand. Case law from foreign jurisdictions is, therefore, not entirely helpful in clarifying or predicting Connecticut law as the numerous decisions reflect often contradictory outcomes based not only on unique sets of facts but also on the particular language of the appropriate statute authorizing eminent domain. In some jurisdictions, an industrial park or an equivalent public business enterprise has been found to be an invalid purpose and will not be upheld. See Merrill v.City of Manchester, supra, 499 A.2d 216; Daniels, Director v.City of Fort Smith, 594 S.W.2d 238 (1980); City of Little Rock v.Raines, 411 S.W.2d 486 (1967). Conversely, there are instances where the creation of an industrial park serves a public purpose.Prince George's County v. Collington Crossroads, Inc.,339 A.2d 278 (1975); Cannata v. City of New York, 182 N.E.2d 395 (1962).
This court is of the opinion that under Connecticut law, an industrial park such as the one proposed by Orange may be, in general, a public purpose. Several factors exist that lead this court to such a conclusion. For one, the concept of public purpose has previously been interpreted in a broad and flexible manner by the courts. Likewise, the definition of what is "necessary" to accomplish such a public purpose has been liberally construed to include that which is "reasonably" necessary and not that which is absolutely necessary. AlgonquinCT Page 1812Gas Transmission Co. v. Zoning Board, 162 Conn. 50, 56,291 A.2d 204 (1971). Thus, unlike the holdings of several foreign courts, a condemnation of necessary land based on the increase of the tax base, as well as a desire to preserve the integrity of an industrial zone, may very well be a public purpose under Connecticut law. But see, Merrill v. City of Manchester, supra,499 A.2d 216. Such an expansive view of what constitutes public purpose is especially warranted since the legislature, in Connecticut General Statutes § 8-186[4], has expressly stated that the creation of business and industry is of paramount importance as a policy for the state. Other statutes, such as8-30g, which exempts industrial zones from the affordable housing provisions of that statute, underline the importance of industry as a public purpose.[5] By so stating, the legislature has created a presumption as to the validity of the acquisition of land for purposes of industry.
It is well-settled in this state that property taken for a public purpose may be transferred to private individuals to carry out that public purpose. Fishman v. Stamford, 159 Conn. 116, 125,267 A.2d 443, cert. denied, 399 U.S. 905 (1970). Such precedent, however, does not leave the court without reservations as to the public purpose of the proposed industrial plan. Primarily, there appear to be no set limitations on the use of property once it is transferred to private ownership. In this respect, there is some concern that the land will not be used for the public purpose it was originally taken for. See Casino Reinvestment DevelopmentAuthority v. Banin, 727 A.2d 102 (1998) (condemnation improper where party that will receive benefit of condemnation has, in effect, a blank check with respect to future developments).
There is no evidence, however, that land to be taken for the industrial park will be used for anything other then the stated purpose. For one, the land is now exclusively zoned for industry and based on the arguments of Orange appears to be so in the future. The likelihood that the land will be used for a non industrial use appears to be minimal. Moreover, the deficiency alluded to can be, it appears, cured quite easily through the inclusion of a binding covenant as to the intended nature of the condemned land whenever that land is transferred from the municipality to the private third-party.
Since, there appears to be a presumption that an industrial park serves a public purpose, this court will assume that Orange's contemplated industrial park is, in fact, such a public CT Page 1813 purpose for which eminent domain may be used. Having so assumed, however, the court will now address the more pertinent question, namely, whether Orange's condemnation of the site is proper.
Avalonbay argues that Orange cannot condemn the site because it is already devoted to a public use, affordable housing. Moreover, Avalonbay argues that the town's condemnation is a pretext and, therefore, that Orange should be enjoined from abusing its powers of eminent domain. Since the two arguments are interrelated, the court will address both of them concurrently.
Even though a municipality's condemnation of property via eminent domain may appear facially valid in serving a public purpose, the condemnation is, nevertheless, improper if made in bad faith or under false pretense. See Stoker v. Waterbury,154 Conn. 446, 450, 223 A.2d 514 (1967) (decision to condemn property open to "judicial review to discover if it was unreasonable or in bad faith or in abuse of power conferred); see also PheasantRidge Associates Limited Partnership v. Town of Burlington,506 N.E.2d 1152, 1155 (1987) ("a municipal land taking, proper on its face, may be invalid because it was undertaken in bad faith); 4 Nichols, Eminent Domain, § 4.11[2] ("courts . . . would feel obligated to interfere to prevent an abuse of the discretion delegated to the legislature by an attempted appropriation of land in utter disregard of the possible necessity of its use, or when the alleged purpose was a cloak for some sinister scheme"). In the present case, the court believes that there is evidence to warrant a finding that the defendant municipality proceeded in bad faith. The court will discuss the evidence it feels is pertinent in reaching this conclusion.
Underlying the case is the fact that the plaintiff seeks to construct affordable housing on the site in question. As is now evident from Judge Munro's sustaining of the plaintiff's appeals from the application denials of both the Orange Planning and Zoning Commission and the Inland Wetland Commission, AvalonbayCommunities, Inc. v. Orange Town Plan Zoning Commission, Superior Court, judicial district of New Britain at New Britain, Docket No. 492246 (August 12, 1999, Munro, J.), AvalonbayCommunities, Inc. v. Orange Town Plan Zoning Commission, Superior Court, judicial district of New Britain at New Britain, Docket No. 492660 (August 12, 1999, Munro, J.), the affordable housing application meets Orange's zoning standards and will, in all likelihood, proceed unless Orange condemns the site for the industrial park. CT Page 1814
As the legislature has voiced, affordable housing is a priority in this state and is for the public benefit of all residents in every municipality. Christian Activities Council, Congregationalv. Town Council, 249 Conn. 566, ___ A.2d ___ (1999); see TCR NewCanaan, Inc. v. Planning Zoning Commission of the Town ofTrumbull, Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 384353 (March 5, 1992, Berger, J.) (describing history of affordable dousing legislation). However, even with such a stated priority, affordable housing will not necessarily prevail over all other public interests. If it is shown that other considerations outweigh the need for public housing, the priority for affordable housing will be overcome. See Christian Activities Council, Congregational v.Town Council, supra, 249 Conn. 566, (town successful in showing that need for the preservation of open space and land is greater than the need for affordable housing). Even so, these other considerations are carefully scrutinized so as to preclude the prevention of affordable housing on an ulterior basis.
In Christian Activities, the Supreme Court noted that the site turned down for affordable housing had a "long history of town recognition as particular appropriate for [the preservation of open space and conservation] and of unsuccessful town efforts to acquire it for those uses." See Christian Activities Council,Congregational v. Town Council, supra, 249 Conn. 605 (noting that efforts had been made to preserve the space in question for nearly 25 year). Such a history, the court continued, "precludes any possible inference of pretext on the part of the town, and amply justifies its reliance on the protection of that substantial public interest." Id.
Though Christian Activities was not an eminent domain case, its discussion of affordable housing is, nonetheless, instructive of the deference given to affordable housing matters. Thus, in the present case, the court finds that it is noteworthy that Orange's efforts to preserve the industrial zone are not nearly as substantial as those discussed in Christian Activities. For one, the zone which includes the proposed industrial park, until recently, allowed planned residential developments. Because of this zoning scheme, one of the parcels adjoining the site is currently being used as a seniors apartment complex (Care-Metrix), while another nearby parcel has been approved as a housing development (Bartlett). Thus, while Orange claims that the vacant land surrounding the cite has always been designated for CT Page 1815 industrial use, the present condition of the land sought for the industrial park is a mixture of parcels and uses.
Several retail use applications (notably the proposed Stew Leonard's project and the Music Universe center) were denied prior to the filing of Avalonbay's application. However, the parcels are on the far side of the proposed industrial park and opposite the Avalonbay site. Moreover, there appears to be at least some suggestion that the above mentioned projects were denied by the town not solely for the preservation of the industrial park, but also because of traffic concerns. In any event, it does not appear that there is as detailed a continuous history of preserving the land exclusively for purposes other than affordable housing as was the case with ChristianActivities.
While the land proposed for an industrial park does appear to be well suited for such a use[6], the actual project plan for the industrial park does little to buttress such a contention and, rather, is further indication of the lack of a historical time frame as to the establishment of an industrial park. The court believes that the timing of the project plan, as well as the sparsity of detail in the plan itself, lend credence to plaintiffs' arguments that the industrial park plan is but a pretext in trying to thwart affordable housing on the site. For one, the ideas for an industrial park first begin to take shape only after the affordable housing application was submitted some weeks prior to the issuance of a moratorium on planned residential developments. The moratorium would have precluded Avalonbay's application had it been filed subsequently. Furthermore, the actual project plan was being developed only after Avalonbay's proposal to build affordable housing. Interestingly, the project plan was not yet complete at the time that Orange initiated eminent domain proceedings, for the second time, against the site.[7] In this regard, the condemnation proceedings seem premature and give the appearance of undue haste. The court can only conclude that Orange's reasons for such actions were to stop the Avalonbay developers from proceeding.
The project plan itself shows evidence of being hastily assembled and poorly envisioned. While the evidence offered by the defendant's expert planner shows that the project plan met the essential attributes of a basic development plan, the overwhelming evidence suggests that the project plan exhibited but the bare minimum amount of information and planning as to any CT Page 1816 future industrial park. The evidence offered by the Avalonbay through the testimony of experts shows that the plan was deficient in numerous areas ranging throughout the plan. While the town of Orange did not have to seek state approval of the plan,[8] state planners found the project plan "evasive and vague." Indeed, looking at the project plan, it is evident that the project plan could be described, at best, as incomplete. While the plan discusses the site, it is virtually silent as to the rest of the acreage that is to comprise the industrial park. Thus, while the project plan discusses the bare minimum as to the proposed site for affordable housing, it does not even do so for the rest of the project.
While the haste and sparsity that typify the project plan weigh heavily in the court's opinion as an indication of Orange's bad faith, the actions and statements of the Orange board of selectmen, as well as other officials in Orange, are more indicative of the general attitude and motives exhibited by Orange in regards to Avalonbay's affordable housing application.
From the time when Avalonbay filed its application, Orange's conduct shows a pattern of attempting to expressly prohibit the construction of the proposed affordable housing project. Remembering the failure of other municipalities in stopping affordable housing from proceeding, Orange officials made an intentional decision to fight the application. One aspect of the fight against the affordable housing proposal was the industrial park project and the belief that eminent domain was a way of preventing affordable housing.[9]
The officials of Orange strategized against Avalonbay by attempting to downplay affordable housing by focusing on the high costs with which the town would be burdened if the application proceeded. As the evidence from the hearing shows, many of the representations made by Orange were gross exaggerations and misleading. While the evidence at the hearing showed that the number of school age children living in the Avalonbay apartments would be less than twenty, town officials estimated that as many as seventy school age children would live there. As such, town officials conveyed a fear that a new school would have to be constructed at a substantial cost to the taxpayers.
The proposed housing project was the subject of other speculations that demonstrate Orange's reluctance toward the acceptance of Avalonbay's proposal. Without any sort of CT Page 1817 statistical evidence, the town police chief proffered warnings about higher crime risks and the need for associated costs that would be incurred because of the housing project. Similarly, the town fire marshal explained that the town was not equipped to combat any fires at the site. The fire marshal, however, did not explain that the town was soon obtaining a new fire engine that could easily accommodate the highest points of the Avalonbay project site.
The court feels that the cumulative evidence discussed above shows that the town of Orange was acting in bad faith in trying to prevent affordable housing and that the attempt to condemn the site for the industrial park is but an improper pretext. At one point, in what the court construes as being a general indication of the attempt to discourage affordable housing, the town apparently offered to allow the project to proceed as long as it was redesigned as housing for the elderly. Statements that Orange is better off if the site was overrun by weeds is likewise indicative of the attempt to stifle affordable housing.
The need for affordable housing has to be determined at the local level. Christian Activities Council, Congregational v. TownCouncil, supra, 249 Conn. 605. As discussed by Judge Munro in related matters before that court, Orange's contention that there are plenty of opportunities for low-middle income families is false. The evidence before this court further shows that the lack of space and the present moratorium create a situation where the availability of affordable housing exists only in theory and not in fact. That there might be select houses available to be purchased by low/middle income families does not take away from the reality that low/middle income families may not be ready or able to actually purchase these homes.[10]
The town of Orange, accordingly, has a void to fill when it comes to meeting the public need for affordable housing. To uphold Orange's condemnation of land specifically devoted to that purpose would, in light of the evidence discussed above, be improper.
The court, accordingly, finds that the plaintiffs are entitled to a permanent injunction as to their first and second counts. The court, therefore, enjoins the Town of Orange from proceeding with its plans for an industrial park and enjoins Orange from proceeding with any plans for the condemnation of the Avalonbay site. CT Page 1818
In its third count, Avalonbay brought an action against the defendants based on the Federal Fair Housing Act, 42 U.S.C. § 3601, et seq. and its state counterpart, C.G.S. § 46-64c, et seq. Specifically, Avalonbay relies on 42 U.S.C. § 3604(a) which states that it is unlawful to "make unavailable or deny, dwelling to any person because of . . . familial status." Familial status is defined as "one or more individuals (who have not attained the age of 18 years) being domiciled with (1) a parent or another person having legal custody of such individual or individuals; or (2) the designee of such parent or other person having such custody . . ." 42 U.S.C. § 3602(k). The state counterpart, § 46-64c contains similar language.
Avalonbay argues that Orange's move to condemn the property violates the Fair Housing Act (FHA) because the condemnation is based, at least in part, on the desire to prevent an increase of school-aged children in Orange. In support of this proposition, Avalonbay cites to instances where Orange town officials spoke out against the affordable housing project by arguing that the influx of families would necessitate the construction of a new school at the expense of the taxpayers. Avalonbay also relies on an incident where the first selectman of Orange allegedly proposed that the affordable housing project could proceed if it were limited to housing for seniors rather than the proposed family housing.
The Connecticut Supreme Court has noted that the Connecticut counterpart to the FHA is governed by case law surrounding the federal fair housing laws. See Chestnut Realty, Inc. v.Commission on Human Rights Opportunities, 201 Conn. 350, 358,514 A.2d 749 (1986). Under federal law, a FHA violation may be established on a theory of disparate impact or one of disparate treatment. LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 425 (C.A.2 (N.Y.) 1995).[11] This court will address the disparate treatment theory first.
In the most common of disparate treatment cases, the plaintiff may establish a prima facie case by meeting the four-prong test established in McDonell Douglas Corp. v. Green, 411 U.S. 792 and applied to the Fair Housing Act in Robinson v. 12 Lofts Kentby,610 F.2d 1032, 1036-43 (2nd Cir. 1979). The plaintiff must show that (a) the plaintiff belongs to a class protected by the statute; (b) the plaintiff sought and qualified for housing; (c) the plaintiff was denied the opportunity to acquire the housing; CT Page 1819 and (d) the housing remained available. Soules v. U.S. Dept. ofHousing, 967 F.2d 817. In stating a claim under FHA, the plaintiff need allege only a discriminatory effect, and need not show that the decision complained of was made with discriminatory intent. U.S. v. Yonkers Board of Education, 837 F.2d 1181, 1217
(2nd Cir. 1987), cert. denied 486 U.S. 1055 (1988). If the plaintiff states a prima facie case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for its action. Soules v. U.S. Dept. of Housing, supra,967 F.2d 817; Levy v. Commission on Human Rights Opportunies,236 Conn. 96, 108 671 A.2d 349 (1996). Once the defendant offers a legitimate, nondiscriminatory reason, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the proffered reason is pretextual. Id.
Typically, the cases discussing an FHA violation due to "familial status" rely on the four-prong test to see if the plaintiff was treated differently, and illegally, than other members of the public. See, e.g., Soules v. U.S. Dept. ofHousing, supra, 967 F.2d 817. The factual pattern of the present case, however, does not lend itself to the four-prongs set forth above. See Huntington Branch, NAACP v. Town of Huntington,844 F.2d 926, 933 (2nd Cir. (NY) 1988). That is not to say, however, that the plaintiffs cannot pursue a perceived FHA violation under a disparate treatment theory. Indeed, the four-prong standard is not rigid and may be modified appropriately depending on the factual scenario. Texas Dept. of Community Affairs v. Burdine,450 U.S. 248, 253 n. 6 (1981). Thus, in situations such as the present, where the plaintiff is challenging the actions of a municipality, the plaintiff can establish his prima facie case by showing that "animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive. . . ." (Citations omitted; internal quotation marks omitted.) LeBlanc-Sternberg v. Fletcher, supra, 67 F.3d 425.
In the LeBlanc-Sternberg case, the appellate court reversed the trial court's finding that the FHA was not violated when the record indicated that there existed a deep animus toward a Hasidic Jewish population and that this animus was the predominant factor in village's various zoning decisions. Examples of the village's animosity toward the Hasidic population included selective zoning that would curtail home synagogues, refusal to grant variances (where similar variances were granted for secular or non-Hasidic parties) and open hostility to the CT Page 1820 Hasidic Jewish population.[12] Viewing this cumulative evidence, the court concluded that the impetus behind the village's zoning decisions was not a legitimate nondiscriminatory reason but rather a clear example of animosity toward Hasidic Jews as a group.
While the facts in the LeBlanc-Sternberg case are particularly favorable to the plaintiffs as an example of outright prejudice, the court feels that that case illustrates the type of cumulative evidence needed to establish a fair housing action against a municipality under a disparate treatment theory. After reviewing the record in the present case, the court is not convinced that Avalonbay has made such a showing in support of its FHA claims.
To support their FHA claim, Avalonbay relies principally on the various statements made by town officials concerning the impact a large affordable housing project might have on the town school system and the heavy costs which would result from the additional influx of students. Though evidence gathered at trial shows that these statements were grossly exaggerated as to the actual number of students and their fiscal impact on the town, the court does not find that these statements are evidence of discriminatory animus toward a class, "familial status," protected by the FHA.
The only evidence offered by Avalonbay that suggests that there was a disparate treatment of potential families with children at the proposed affordable housing site was the alleged statement by the first selectmen stating, in effect, that the town would welcome senior housing rather than affordable housing without age restrictions. Any such statement, however, was made relatively early in the relationship between the parties in the case and, as evidenced by the various selectmen, undermined by the fact that, ultimately, the town opposed any housing whatsoever on the proposed site. In the context of such a broad opposition as to any housing, the statements regarding additional costs to the town as a result of the influx of children are viewed by this court as opposing housing in general and not families specifically. Though such an analysis might beg the question as to whether a desire to preclude families with children begets a desire to prohibit housing or vice versa, the defendants' statements as to the increase of criminal activity and the supposed impact to the volunteer fire department support a general view that Orange opposed the idea of (affordable) housing and not the presence of families with children. CT Page 1821
The cumulative evidence suggests that the town, in an effort to stop any housing from proceeding on the site, and in an effort to preserve its industrial zone, would most likely have had condemned the site in the same fashion even if the town did not buttress its position with political rhetoric as to the costs associated with an influx of families with children. See Smith Lee Associates, Inc. v. City of Taylor, Mich., 102 F.3d 781, 790
(6th Cir. (Mich.) 1996). While, as discussed as above in regards to Avalonbay's first and second counts, the condemnation of the site might be improper in the context of affordable housing, there is no evidence to suggest that such a condemnation is also improper in the context of fair housing under the disparate treatment theory.
Similarly, the court also finds that the evidence does not support Avalonbay's recovery for an FHA violation under the disparate impact theory.
To establish a prima facie case under the disparate impact theory, the plaintiff must show that the challenged practice of the defendant "actually or predictably results in . . . discrimination; in other words that it has a discriminatory effect." Huntington Branch, NAACP v. Town of Huntington, supra, 844 F.2d 934. Discussing a prima facie case as to racial segregation, the Huntington court analyzed the discriminatory effect of the challenged practice as to the adverse impact on the protected class and harm to the community by the perpetuation of such segregation. Id., 937.
Applying a factual variation of this analysis as to the discriminatory effect of the condemnation on families with children, the court finds that Avalonbay has not made a prima facie case as to any disparate impact of the condemnation. For one, as evidence from the trial shows, the actual number of children — or families with children — projected within the affordable housing project is far smaller than any number the town may have originally claimed. Thus, the proportional impact as to the number of families with children that are affected by the decision of the board, compared to the proportion of families with children that are not affected by the condemnation would appear to be quite modest. Moreover, there is no evidence that the condemnation will, for purposes of the FHA, create a disparate impact that would keep families with children from moving into Orange. That is, there is no evidence to suggest that the condemnation will keep Orange from being a fully integrated CT Page 1822 community that is available to families with or without children.
Since the court finds that Avalonbay failed to show that the condemnation does not create a disparate impact as to families with children in the town of Orange, there is no need to examine the town's stated reasons for the condemnation.
Accordingly, Avalonbay is not entitled to damages for any allegedly improper conduct by Orange under the Fair Housing Act.
Avalonbay's fourth count alleges that First Selectmen Sousa tortiously interfered in the contract between Avalonbay and Ernest Cuzzocreo and that, as a result, the plaintiffs have suffered damages. Specifically, Avalonbay argues that Sousa, "outraged" by Avalonbay's application, led a campaign of opposition against the project which included misleading information and half-truths. Allegedly, Sousa also contacted Cuzzocreo and urged him to distance himself from Avalonbay and promised that he would help Cuzzocreo in other aspects if, in fact, Cuzzocreo did so.
Tortious interference with contract rights or other business relations has been long recognized as a cause of action in Connecticut courts. Blake v. Levy, 191 Conn. 257, 260,464 A.2d 52 (1983). However, not every act that disturbs a contract or business expectancy is actionable. Id. "For a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. . . ." (Citations omitted.) Daley v.Aetna Life Casualty Co., 249 Conn. 766, 805, ___ A.2d ___ (1999). "An action for intentional interference with business relations requires the plaintiff to plead and prove at least some improper motive or improper means . . . [t]he plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but `intentional interference without justification.'" Id., quoting, 4 Restatement (Second), Torts § 766, comment (s) (1979). Thus, the plaintiff bears the burden of alleging and proving a lack of justification on the part of the actor. Daley v. Aetna Life Casualty Co., supra, 249 Conn. 805.
Avalonbay has offered into evidence several instances where First Selectmen Sousa knowingly misled other town officials and CT Page 1823 the public. The plaintiffs point to the alleged if conversation with Cuzzocreo as indicative of bad faith and if malice on the part of Sousa.
Were it not for the fact that Sousa was engaged in his official capacity as first selectmen when his statements were made, it appears, without actually deciding, that Avalonbay's allegations might, at first glance and giving the plaintiffs the benefit of the doubt, meet the basic elements of a tortious interference cause of action. However, since Sousa was acting in his official capacity when these incidents occurred, the legislative immunity which encompasses his actions moots the question of tortious interference.
As the United States Supreme Court has recently reiterated, the principle that legislators are absolutely immune from liability in their legislative activities has long been recognized in Anglo-American law. Bogan v. Scott-Harris, 523 U.S. 44, 49 (1998) (holding that legislative immunity applies to suits brought under § 1983). Connecticut courts have recognized the doctrine of absolute legislative immunity. See, e.g. Anonymous v. Conn. BarExamining Comm., Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 534160 (August 17, 1995, Corradino, J.); Bials v. Town of Portland, Superior Court, judicial district of Middlesex at Middletown, Docket No. 059608 (July 28, 1992, Higgins, J.)
The plaintiffs cite Mulligan v. Rioux, 229 Conn. 716, 728-30,643 A.2d 1226 (1994), for the proposition that the "standard of qualified immunity that protects public officials from civil suits pursuant to § 1983, arising from the performance of their discretionary functions, is distinct from that established under our common law." Id. Mulligan, however, is factually inapposite and inapplicable to the present scenario. In that case, the Supreme Court discussed the doctrine of qualified immunity as applicable to a public official. Thus, the Mulligan court held that the lower court erred in applying the federal "objective reasonableness" standard as to a malicious prosecution claim rather than seeing if the alleged conduct fell within the applicable exception, malice or wantonness or intent to injure, to the qualified immunity of a municipal employee in the exercise of a discretionary duty.
In the present case, the individual defendant Sousa, as first selectmen, occupies a hybrid legislative/executive position CT Page 1824 common to local municipalities. As selectmen, Sousa is part of the political process that legislates the town of Orange. As first selectmen, Sousa is also an executive with additional powers and duties.
"Absolute legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity." (Internal quotation marks omitted.) Bogan v. Scott-Harris, 523 U.S. 54. "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it. The privilege of absolute immunity would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial . . . or to the hazard of a judgment against them based upon a jury's speculation as to motives." Id.
Stripped of all considerations of intent and motive, it is clear to this court that the defendant Sousa's actions were of a legislative character. The statements and actions attributed to Sousa by the plaintiff occurred either in the course of public meetings concerning legislative acts or, as Sousa's individual meeting with Cuzzocreo, while Sousa was acting in his hybrid legislative/executive capacity. Thus, Sousa is protected with absolute, and not qualified, immunity for any and all of his actions. As such, the plaintiffs cannot recover for any allegations that Sousa tortiously interfered with the contract between Avalonbay and Cuzzocreo.
The court, accordingly, finds in favor of the defendant Sousa on the fourth count.
In its fifth count. Avalonbay seeks indemnification from the Town of Orange in the event that the plaintiffs are successful in securing a recovery under either the third count (violations of the Fair Housing Act) or the fourth count (Tortious Interference with Business Relations). Since the court has found in favor of the defendants of both the third and fourth count, the fifth count must fail as well.
Pursuant to the above discussion, the court, accordingly, permanently enjoins the Town of Orange from proceeding with its current designs for a hi-tech industrial park on the property described in the plan for such. The court also enjoins the Town of Orange from using its power of eminent domain in condemning the property on which Avalonbay proposes to construct affordable housing. The court finds for the defendants on the third, fourth CT Page 1825 and fifth counts.
Judgement may enter in accordance with the above.
THE COURT
Curran, J.