[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this case the Pequonnock Yacht Club, Incorporated initially brought suit against the City of Bridgeport ("City"), its Redevelopment Agency and the Bridgeport Port Authority to prevent the defendants from taking the plaintiff's property by eminent domain. Since that complaint was filed, the City has acquired title to the plaintiff's property by eminent domain and the relief now sought by the plaintiff is a mandatory injunction ordering the defendants to reconvey the plaintiff's property back to it. The operative complaint in this matter is the Amended Complaint dated March 1, 2000, and it should be noted that prior to the commencement of trial the plaintiff withdrew the first count of that complaint and is only proceeding on the second count.
The property in question, which comprises two acres, has been owned and operated by the plaintiff as a private yacht club and marina for nearly 95 years. The property, which is located at 66 California Street in Bridgeport, is comprised of a two story clubhouse containing a bar, restaurant, recreation and meeting rooms, docks containing 196 boat slips, a gas dock, which is open to the public, and a storage area for those boats that are removed from the water during the winter. The club is open all year long. The club is chartered for 250 dues paying members and there are currently 237 members. There is a $500 application fee, and upon approval, yearly dues are payable as well as a fee for boat mooring. Although the club is private, guests of members are obviously permitted. Although the club is private there was testimony that members of the public are allowed to enter the premises, but not the dock area, and may purchase food and beverage items as long as they are signed in by a CT Page 16004 member. However, the public is not generally invited to the premises.
The buildings and docks on the premises are in good condition. There is ample parking on the premises and in two lots across from the clubhouse. Approximately six people are employed on the premises, all associated with the restaurant and bar. All outside and dock related services are supplied by the membership. The club had payed approximately $5,000 in annual real estate taxes.
The property in question is part of a larger 50 acre piece of property known as Steel Point, which is the subject of the East Side NDP No. 1 Urban Renewal Plan Amendment No. 8 (plaintiff's exhibit 11). That plan was first adopted in 1970 and has gone through eight amendments. The latest amendment was approved by the Bridgeport Redevelopment Agency on April 14, 1998 and by the Bridgeport City Council on June 15, 1998. of the total of 50 acres, approximately 10 acres are situated on Bridgeport Harbor comprising six separate water dependent users, one of which is the plaintiff. The other 40 upland acres are generally in a blighted condition and many of the buildings on those properties have already been demolished. All of the property within the 50 acres with the exception of one have now been acquired by the City by eminent domain. All of the witnesses agreed that the great majority of the area is economically depressed lending little in the way of taxes and employment to the City.
The previous East Side NDP Area No. 1 Urban Renewal Plan, Amendment No. 7 was approved on August 2, 1989. It dealt with the same 50 acres that is the subject of amendment no. 8. The major difference in the two amendments is that amendment no. 8 contemplates the taking by eminent domain of all 50 acres whereas amendment no. 7 did not contemplate the taking of the ten acres owned by the six water dependent users. At the time that amendment no. 8 was adopted, the City was already in negotiations with Alex Conroy, who eventually became the City's developer, and he and the City then concluded that the project scope and the need for financing support required the taking of all of the property.
Once the new plan was announced, the City acquired the services of T.P.A. Design Group ("T.P.A."), one of whose roles was to assist the six water dependent users to find suitable relocation sites in the event of condemnation. The court is satisfied that T.P.A. made a reasonable effort to relocate Pequonnock but that effort was not successful. Although one or two alternate sites were presented, they paled in contrast to the existing Pequonnock site and the court finds the rejection of those sites by Pequonnock was reasonable. That being said, there does not appear to be any relationship between the City' s failure to provide an alternate site and the City's right to acquire the Pequonnock property by eminent CT Page 16005 domain. Once the City decided to acquire the plaintiff's property, this suit was commenced to block that effort. For several months, the parties continued the plaintiff's request for temporary injunctive relief while T.P.A. and the plaintiff attempted to come up with an alternative site. Those negotiations broke down in late 1999. The City then pursued the condemnation and actually took title to the Pequonnock property in March of 2000. Pequonnock and its members had been ordered to vacate the premises as of October 1, 2000, which date as later extended until April 15, 2001.
By this complaint, the plaintiff is asking this court to issue a mandatory injunction to restore title to the plaintiff. It claims that the eminent domain proceedings are illegal, arbitrary, unreasonable and in abuse of the discretion and authority of the defendants in one or more of the following respects.
1. The taking of plaintiff's property is not necessary to accomplish the redevelopment goals of the defendant.
2. The defendants have failed to consider the integration of plaintiff's marina into the Harbour Place of Steel Point Redevelopment Plan.
3. The plaintiff's property is not deteriorated, substandard or detrimental to defendants' plan for the area.
4. The purpose for which the plaintiff's land is to be taken is nor presumably a public use, but on the contrary, is a private purpose to cause ownership of the land to be taken from one group of private owners and to be turned over to another person or group.
As to the last claim, it is true that after retaining a buffer zone along the Harbor, it is the City's intention to sell the balance of the land to a private developer or developers who would then build the shopping malls, hotels and recreational facilities contemplated in the plan.
The plaintiff, in support of its complaint and its burden of proof, presented three witnesses as well as portions of the deposition testimony of Michael Freimuth, the Chairman of the Bridgeport Redevelopment Agency and its Director of Planning and Development. Its first witness, Stuart Rainger, has been a board member and Commodore of the plaintiff for many years. His testimony supported much of what the court has already CT Page 16006 related.
The plaintiff's next witness, Fred Cisko, was the plaintiff's Commodore in 1998 when the City announced its plan to acquire the plaintiff's premises. He described his efforts with T.P.A. to find a suitable relocation site and how that effort failed. He testified he made it clear to everyone from the City that Pequonnock wanted to remain on its site; that Pequonnock would cooperate with the City and its developer to improve or redesign its site or build anything the City wanted. He admitted the plaintiff never presented any formal plan nor was there any evidence presented as to the ability of the plaintiff to fund any such plan.
He was instrumental in the plaintiff's July 14, 1998 letter to Bridgeport's Mayor, Joseph Ganim, (plaintiff's exhibit 6) which spelled out in detail the plaintiff's desire to remain, its support for Harbour Place and its willingness to sit down with City officials and try to work it out. This lawsuit was commenced on July 2, 1998, and as a result of it, the City, by latter from Mr. Freimuth, declined to respond. (Plaintiff's exhibit 7.) Mr. Cisko testified further that the City never made any offer or effort to integrate the plaintiff into the redevelopment plan.
The plaintiff then presented the testimony of Professor John Mullen, its expert, who testified generally about the scope and size of the redevelopment plan and the necessity for the defendants' taking of the plaintiff's property. That plan encompassed a large retail mall project with hotels, conference center and allied recreational facilities with an estimated value of Seven Hundred Thirty-one Million Dollars. That sum plus the Two Hundred Million Dollars of public support would bring the total value of the Harbour Place project to nearly One Billion Dollars. Mr. Mullen testified that he believed, based on the condition and nature of the plaintiff's use of its property, that its continued existence was compatible with the redevelopment plan and Mr. Conroy's plan for Harbour Place, and therefore it was not necessary to acquire the plaintiff's property by eminent domain.
The defendants' countered with several witnesses including tins Redevelopment Director, Michael Freimuth, who generally described the process of getting to amendment no. 8 of the redevelopment plan, its efforts to relocate the plaintiff to another site and their opinion that all of the property within Steel Point, including all of the water dependent users, was necessary to acquire to support and implement the $731 million dollar retail development plan proposed by Mr. Conroy.
The defendants then presented the testimony of Kathryn Madden, their CT Page 16007 expert, who, as well as the plaintiff's expert, Mr. Mullen, had broad experience with urban design and waterfront development. As with Mr. Mullen, she personally inspected the premises, reviewed the redevelopment plans as amended and the specific Harbour Place project proposed by Mr. Conroy. She provided her own opinion that in order to implement that plan it was necessary to acquire all of the properties contained within Steel Point, including all of the water dependent users. This is how the case concluded on August 8, 2000. A briefing schedule was ordered and both sides filed their briefs by August 29, 2000.
Just at the time the court embarked on its memorandum of decision, two articles appeared in the "Connecticut Post" that directly impacted this case. in the first article dated September 22, 2000, (Court's exhibit no. 1) in a front page story entitled "$1b deal in jeopardy", City officials gave Mr. Conroy 60 days to show strong support from at least five major tenants or the deal would be scrapped and a new plan to develop Steel Point would be sought. The second article, an editorial in the "Connecticut Post" of September 6, 2000, generally discussed the same subject.
The court then summoned all of the parties to a conference at the courthouse on September 6, 2000, to discuss these developments. The court reopened the case for all purposes, marked the two newspaper articles as court exhibits 1 and 2 and continued the matter for further proceedings. At that time, the parties continued the date for the plaintiff's vacating of its premises from October 1, 2000, until April 15, 2001.
The court, by letter dated October 4, 2000, to all counsel scheduled a hearing for December 15, 2000, to allow any party to present any evidence pertinent to the case and in particular to the newspaper articles, which at a minimum placed at least Mr. Conroy's project in some jeopardy. Since that letter and the hearing held on December 15, several additional articles appeared the "Connecticut Post" concerning Harbour Place and the Steel Point Development. The general import of those articles was that the Mayor of the City of Bridgeport, Joseph Ganim cancelled the Harbour Place project of Mr. Conroy because of his failure to provide sufficient support concerning the viability of his project, which the City of Bridgeport had demanded in early September. Those articles were marked as Court's exhibits 3, 4 coo at the hearing conducted on December 15, 2000.
The only witness called to testify at that hearing was Michael Freimuth, the City of Bridgeport's Redevelopment Director. He testified generally about Mr. Conroy and his Harbour Place Development Plan. Mr. Conroy first became involved with Steel Point and the City in 1997. He was at least partially instrumental in having amendment no. 8 to the East Side N.P.D. No. 1 Urban Renewal Plan adopted, which for the first time CT Page 16008 contemplated the taking of the water dependent users including the plaintiff. Mr. Conroy was a large scale developer and by contract he became the City's developer for Steel Point based on his 731 million dollar plan for Harbour Place. The size and value of the project is important because it must be large enough to support the project's funding and bonding that was already in place.
Until Mr. Conroy withdrew from the project in mid October of 2000, he partnered himself with three successive large project developers, Lend lease Investors, C.B.L. of Tennessee and the Taubman Company, in an effort to interest sufficient retail tenants to commit to the project. Those efforts for one reason or another proved unsuccessful.
Mr. Freimuth further testified that the defendants have nut given up on the project and in fact are pursuing it at this time. He identified defendants' exhibit C entitled "Request for Proposals Steel Point Peninsula" dated December 11, 2000, as further evidence of the defendants' continuing interest. It is of interest to note that in Defendants' exhibit 4 at page 2, paragraph IV entitled "Status of Acquisition and Relocation of Water Dependent Users", there is no mention of this lawsuit at all, the result of which could surely affect at least one or more of the water dependent users.
The Request for Proposals (defendants' exhibit 3) is an invitation to developers to make a proposal for the use of all or a portion of Steel Point. There is nothing contained therein that describes just how much money must be invested by the private developer or developers, but Mr. Freimuth admitted that in order to support the project the value of the total developer contribution would have to be in the 400 to 500 million dollar range. The deadline for filing proposals is listed as January 31, 2001, and Mr. Freimuth testified that he hoped the City would be in a position to choose a developer or developers by March 1, 2001. He further opined that the development now would be commercial rather than retail because of the obvious problem Mr. Conroy and his partners had in locating retail tenants for the earlier plan. Mr. Freimuth further testified that the defendants have developed a web site for the project, had had 100 hits on the subject and 17 parties have registered an interest in the protect and have sought further information.
On cross-examination and in answer to questions posed by the Court, Mr. Freimuth admitted he had no knowledge as to how many, if any, persons or companies would actually make a proposal by January 1, 2001, what the projected size of any proposal would be and whether any proposal, if filed, would be accepted by the defendants. To a specific question posed by defense counsel as to whether any thought had now been given to keeping the plaintiff on the site and assimilating it into whatever CT Page 16009 proposal might be approved, his answer was, "Right at this hour, no." The Court pursued that question because it is at the heart of this controversy. In light of the fact that the future project will probably be commercial rather than rental, because of the fact that no one knows whether there will be one, several or no developers, and because no one knows what the dollar value or scope will be of any proposal, that question simply cannot be answered at this time.
It is quite clear that no one can predict now with any certainty whether any proposals will be submitted by January 31, 2001. To the extent that any proposals are submitted, no one can predict with any certainty whether they will be accepted by the governmental authorities which must approve them. It all depends on the size, scope and dollar value of the project that will drive the bonding requirements for the sire.
What is absolutely clear to the court is that the case presented to it on December 15, 2000, is completely different than the case that originally rested on August 8, 2000. At that time, the defendants had a developer, Alex Conroy, and had a contract with him to develop a 731 million dollar retail mall that was sufficient to drive the bonding requirements and now they have lost him and his plan for Harbour Place. All they have now is a Request for Proposals which is just over one week old.
At the end of the hearing, the Court offered counsel for both parties two alternatives. The first was for the Court to simply decide the case on the state of facts that currently exist or, secondly, to extend the hearing to a future date, which would necessitate granting the plaintiff continued occupancy of the premises for some agreed upon period. That would allow the process to play out, to investigate future proposals, and to determine whether the plaintiff could be assimilated into some future plan by remaining on its present site. After some discussion between the parties, the Court was advised that the parties wished the Court to decide the case based on the current record, which it will now do.
In this case, both parties have lawful but competing interests and objectives. The plaintiff rightfully attempts to protect itself and its members who have been on this site for nearly 95 years. They have been good citizens of Bridgeport and have certainly done nothing to deserve the loss of their premises even If they are well compensated. The defendants, on the other hand, have every right to implement a redevelopment plan, to eradicate a blighted area and to develop an upgraded and tax producing area. The case may have been easier to decide on August 8, 2000, but now the Court must decide the issues on the state of facts as they exist on December 15, 2000. CT Page 16010
 LAW
The authority of the defendant, Bridgeport Redevelopment Agency, to condemn the plaintiff's property is conferred by statute. Connecticut General Statutes § 8-126 provides, in relevant part, "[c]he legislative body of any municipality may . . . create a new redevelopment agency. . . ." Connecticut General Statutes § 8-143 confers on a redevelopment agency "all the powers necessary or convenient to undertake and carry out urban renewal plans and urban renewal Projects, including the authority to acquire and dispose of property." Connecticut General Statutes § 8-128 grants the Bridgeport Redevelopment Agency the power to "acquire real property by eminent domain with the approval of the legislative body of the municipality. . .
The power of eminent domain is an Inherent and necessary attribute of sovereignty, superior to all private property rights. See Rosenthal Rosenthal, Inc. v. N.Y. State Urban, 771 F.2d 44 (2d Cir. 1985). The Redevelopment Act, pursuant to which the defendant, Bridgeport Redevelopment Agency, condemned the plaintiff's property, authorizes the taking of land in an area that has been determined by the agency to be a redevelopment area. See Gohld Realty Co. v. Hartford, 141 Conn. 135, 141
(1954). In enacting the Redevelopment Act the legislature defined "Redevelopment Area" as an area partly or wholly of vacant or unimproved land or of land with structures and improvements thereon, and may include structures not in themselves substandard or insanitary which are found to be essential to complete an adequate unit of development, provided that the redevelopment area is deteriorated, deteriorating, substandard or detrimental. See Connecticut General Statutes § 8-125.
"Municipal authorities have broad powers to effectuate an urban renewal plan . . . and so long as they act within the limits of the formal powers conferred upon them and in due form of law, the power of the courts to supervise, review or restrain them Is necessarily limited. But when those powers are exceeded or exercised unreasonably or in bad faith . . . their actions are open to judicial review." United Oil Co. v. Urban DevelopmentCommission, 158 Conn. 364, 381 (1969). Thus, the condemnee in a redevelopment case may secure a judicial review of the necessity and legality of the raking and has the opportunity of alleging and proving its illegal character in any of the respects alleged, and If it sustains its burden of proof, it may secure injunctive relief. Fishman v.Stamford, 159 Conn. 116, 121 (1970). See also Gohld Realty Co. v.Hartford, supra.
That is exactly what the plaintiff has done here when it alleged in paragraph 3A of its Amended Verified Complaint of March, 2000 that the CT Page 16011 taking of its property was not necessary to accomplish the redevelopment plan of the defendants. That is the specific issue that was tried by the court on August 7 and 8 of 2000. In reviewing that claim of necessity, it is necessary to be fact specific as to this case.
The redevelopment plan at issue, "East Side NDP Area No. 1" is now 30 years old, having gone through eight amendments over that time. Until the final amendment in 1998, the water dependent users, including the plaintiff, were never contemplated to be removed from their property by eminent domain. It was only after Alex Conroy became involved with Steel Point and the City in 1997 that the change was made to add the ten areas occupied by the six water dependent users to the property to be acquired by the defendants by eminent domain. It is clear that Mr. Conroy was at least instrumental in that move because he wanted all of the property to build his retail mall and recreational project known as Harbour Place.
It is now obvious where that project is. After three years of effort and with the assistance of three partners or associates, Conroy was unable to produce any tenant base to support the plan and he has withdrawn. The Redevelopment Agency is now satisfied that a large scale retail mall will not fly at Steel Point and it now believes through its director that the eventual plan will become commercial.
Nearly all of the evidence at the trial was directed towards and assumed that the Conroy plan for the retail mall was alive and well. Both of the experts representing the respective parties made that assumption as the basis for their opinions.
Mr. Mullen, on behalf of the plaintiff, concluded that the present use of plaintiff's property was not only compatible with the redevelopment plan but matched it perfectly (see pages 3 and 4 of plaintiff's exhibit 11), that its property was in standard condition and could be cosmetically improved to match any new development, that it was not necessary to take the property to provide public access to the waterfront, that it was not necessary to take the plaintiff's property to assure the success of Mr. Conroy's plan for Harbour Place and that the defendants' decision to take the plaintiff's property and its refusal to sit down and discuss with the plaintiff the possibility of assimilating their property into Mr. Conroy's plan to be neither reasonable or rational.
The defendant's expert, K. Madden, who became involved somewhat later than Mr. Mullen, predictably came to the opposite conclusion. As with Mr. Mullen, she reviewed the property, the redevelopment plan and Mr. Conroy's 731 million dollar plan for Harbour Place. She concluded that Steel Point needed a single developer/owner, that the plaintiff's CT Page 16012 property was not compatible with the plans for Harbour Place, and without all of the property, Mr. Conroy's plan for Harbour Place would fail. As we a1 know now, it failed anyway because Mr. Conroy was never able to produce a tenant base satisfactory to the defendants. It is not necessary to choose between these conflicting opinions because the assumptions now are different. The general opinion of Mr. Mullen is, however, more consistent with the present state or affairs and the plaintiff's claim.
The status of Steel Point has radically changed since August 8, 2000. In Mr. Freimuth's opinion, the direction of the plan has changed from retail to commercial, the concept of a single developer has changed to possibly multiple developers and the size and scope of the plan though unknown at this time is, again in Mr. Freimuth's opinion, considerably smaller than the 731 million dollar plan of Mr. Conroy.
Steel Point, as of December 11, 2000, is basically going out to bid again. No one can predict whether any satisfactory proposal will be submitted. Mr. Freimuth, at a minimum, had to concede to the possibility of another amendment to the redevelopment plan if no suitable developer or developers are found.
The defendants' brief continuously makes reference to the value of waterfront property and how it will enhance the defendants' prospects for a successful plan. That fact, which is not lost on the court, also emphasizes the value of that same property to the plaintiff. For 95 years its members have enjoyed a recreational facility which use is not harmful to the defendants. The court specifically finds that although the defendants made an honest effort to find a suitable substitute site for the plaintiff, none was available. Waterfront property such as the plaintiff's is a shrinking commodity. Just because the property may be desirable to the defendants does not justify its taking by eminent domain. The City must establish that the taking was necessary to implement the plan of redevelopment and that its actions in refusing to discuss with the plaintiff any assimilation of its property into the plan was reasonable and not in bad faith.
That was much easier to do on August 8, 2000, but much harder to do now. More properly, it is the plaintiff's burden to show that the taking of their property was unnecessary to the success of the redevelopment plan and that the City's refusal to discuss alternatives to eminent domain was unreasonable. On the state of the record now, the plaintiff has succeeded in the court's opinion. The testimony of plaintiff's expert, Mr. Mullen, is totally consistent with that finding while the opinion of the defendant's expert, Ms. Madden, was in fact specific to Mr. Conroy's project. She basically opined that if Mr. Conroy did not get the entire peninsula that his particular project would fail. We have no idea what her CT Page 16013 opinion would be if the scope of the project was smaller, there were multiple developers instead of a single developer and the use went from retail to commercial. Without knowing what the scope of any new proposal would be, it is impossible to make use of Ms. Madden's testimony or opinion.
The most significant factor in the court's determination now is a question posed by plaintiff's counsel to Mr. Freimuth as to whether any present consideration has been given to keeping the plaintiff on its property and his response, "Right at this hour, no." The court pressed the issue and asked if that did not mean that at some future time and after reviewing any new proposals for Steel Point that may come in, that that very discussion might not take place. Mr. Freimuth responded that was a very difficult question to answer to which the court responded that was the very issue before it.
As long as there is a question as to whether or not any new proposal will be presented, whether any will be accepted, what its size and scope may be and whether the plaintiff's current use of its property is compatible with the new proposal, it is impossible to conclude that the taking of the plaintiff's property is necessary to effect the redevelopment plan. Should the proposals come in much smaller and for commercial or office use of the property, there is no way of telling now whether the plaintiff's use of its property could not be assimilated into the new plan. Stated another way, it would be unreasonable to take the plaintiff's property and force 300 boat owners to find other moorings, if they are even available, before knowing the answers to the questions already posed. The court concludes that on the present record the plaintiff has proven that the taking of its property is not necessary to effect the defendant's redevelopment plan or any proposal thereunder and it would be unreasonable for the defendants to refuse to sit down with the plaintiff and at least discuss its assimilation with such plans.
The defendants, in their brief, argue that injunctive relief cannot be provided unless the plaintiff pleads and proves irreparable harm. That is not consistent with the prior opinion of Judge Skolnick of February 22, 2000, on the defendant's Motion for Summary Judgment. Judge Skolnick specifically found that no such requirement exists in a case involving the taking of property by eminent domain for redevelopment purposes citingUnited Oil Urban Redevelopment Commission, supra. This court agrees.
The court finds no merit to the Special Defenses. Therefore, the court will grant the relief sought by the plaintiff and order the defendants to reconvey the plaintiff's property back to it.
The defendants are not without future remedy if they should accept a CT Page 16014 new proposal and can establish, based on that proposal, that the plaintiff's continued use of its property would defeat or not be compatible with that plan. Whether that scenario is ever reached is totally speculative at this time.
GORMLEY, J.